# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3488

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Sidney Hamilton, also known as Sid, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  May 16, 2003

Filed:  June 19, 2003

_____

Before WOLLMAN, MAGILL, and BEAM, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

A jury found Sidney Hamilton guilty on all six counts of an indictment charging him with drug conspiracy, drug trafficking, and firearms offenses in violation of 21 U.S.C. §§ 841(a)(1), 846 and 18 U.S.C. §§ 922(g)(1), 924(c)(1)(A). Hamilton was sentenced to forty years in prison on count IV and life in prison on each of the remaining counts, each term to be served consecutively. Hamilton contends that the evidence was insufficient to sustain his conviction on each count

and that the district court[1] therefore erred by denying his motion for judgment of acquittal. We affirm.

## I.

We state the facts in the light most favorable to the jury's verdict. Courtney Hamilton, Sidney Hamilton's nephew, began selling drugs in the St. Louis area in 1995. Courtney testified that he started using a house at 1781 Drake Lane in rural Franklin County, Missouri, after Hamilton suggested to Courtney that there would be less risk if the customers came to him. The house was owned by Courtney but was held in his mother's name. Hamilton lived in a trailer next to the house. Although the trailer had two bedrooms, the master bedroom had no bed and was used only for storage.

Once the crack house was established, the quantity of drugs that Courtney sold increased quickly. Courtney recruited several other people to sell drugs from the house. Hamilton began selling drugs at the house in 1999. Antinette Briggs, Dwuan Carter, and Wil Johnson also sold drugs at the house. Drug sales took place twenty-four hours a day, seven days a week. Courtney and Briggs testified that the sales were made according to a rotation whereby one person would take the first customer, another would take the second, continuing until each had made a sale, at which point the rotation would start over. If a customer approached seeking to make a small purchase, the distributor had the option of passing that customer to the next distributor in line. Courtney set a minimum purchase of $50 to reduce the traffic at the drug house. Crack cocaine was sold for $100 per gram, $50 per half-gram. On occasion, the crack house would offer a sale in which a $100 purchaser received an additional fifty dollars' worth of crack for free. On a busy day, the drug house would

---

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

receive 50 to 100 customers. Courtney testified that approximately 850 grams of cocaine and 150 grams of crack were sold from the house each month.

One prosecution witness, James Luttrell, testified that he spent half of a $98,000 insurance settlement on crack cocaine and the other half on property he eventually pawned to buy crack at the house. Luttrell estimated that he made more than 100 purchases from Hamilton. During the busiest times of the week, there were as many as fifteen or twenty cars parked outside the crack house. Occasionally Luttrell had to park out on the gravel road, walk up to the house, and wait in line for his turn to buy drugs. On several occasions, Luttrell observed Hamilton in close proximity to firearms at the crack house. Luttrell testified that Hamilton encouraged him to continue purchasing drugs even when he had run out of money. In May or June of 2001, after the drug house had been shut down but before indictments issued against Hamilton and twenty-one others charged in the conspiracy, Hamilton delivered crack to Luttrell's house.

A second prosecution witness, Rosa Ann Bialik-Luttrell, wife of James Luttrell, went to the crack house as many as ten times per day and approximately twenty days per month. Bialik frequently saw Hamilton at the crack house and testified that she purchased from him "[j]ust about every time." Her purchases averaged about twenty grams per month. Bialik testified that at busy times she had to wait as long as one hour to get into the house. Bialik observed both Courtney and Hamilton sell crack and cocaine to other customers and stated that firearms were often visible in the house and the trailer in close proximity to Hamilton.

On August 9, 1999, Hamilton misplaced approximately four ounces of cocaine and, believing it had been stolen by one of the last four drug customers, phoned one of them, Mike McAuley, and asked him to come back to the house. Upon McAuley's return, Hamilton struck McAuley on the head with "an axe handle or a hatchet," causing blood to run down his face. Hamilton led McAuley inside the crack house,

where the other three customers he suspected of the theft were waiting. Hamilton then struck each of the four individuals on the head with his gun. One witness testified that Hamilton alternated taking hits from a crack pipe and shooting at the wall between the four individuals. At one point Hamilton ordered each person in turn to place an empty two-liter bottle on his head, at which point he shot the bottle off the person's head. Courtney arrived later and dismissed the four with a warning that he and Hamilton would find out who stole the cocaine and "deal with them our way."

On August 22, 1999, Shelbert Gant walked from his house down the road to Hamilton's trailer to obtain some cocaine. Although Gant had occasionally purchased small quantities from Hamilton, Hamilton usually gave it to him. After Gant entered the trailer, Hamilton started yelling, claiming that Gant owed him $20 for a previous purchase of cocaine, and hit Gant twice on the head with a stick. Gant went home, got his .22 rifle, and returned to the trailer. Gant's wife followed him back to the trailer. Briggs and a crack cocaine customer named Shane Lashley were inside the trailer with Hamilton. Gant fired some shots over the trailer and Hamilton fired back with a pistol through the window. Gant fell to the ground, pretending that he had been hit. Hamilton then turned, said he "wasn't leaving no witnesses," and shot Lashley. Mrs. Gant testified that she saw a man lying on the floor inside the door, heard him say "it hurts," and saw Hamilton point his gun down and shoot twice. Hamilton told Mrs. Gant to go home, handed Gant a pistol, and ordered him to "[s]hoot [Lashley] or else." The next day, Hamilton told Courtney that he had shot Lashley and dumped his body in a ditch.

On September 9, 1999, police officers executed a search warrant at the trailer and crack house. Hamilton, Briggs, and a third individual were present when the officers arrived. Inside a trash can just outside the front door of the trailer, the officers found 106.42 grams of cocaine concealed within a flashlight. An additional 1.60 grams of cocaine powder and 5.4 grams of crack cocaine were discovered in the living room and the utility room of the trailer. The officers also found several crack

pipes, burnt spoons, test tubes, and a digital scale. Detective Grellner, an officer who had been trained in the methods and operations of drug distribution organizations and who had been involved in the investigation of several hundred drug cases, testified regarding notes found in the trailer. In Detective Grellner's opinion, the notes indicated the initials of people who had purchased or were fronted drugs and how much, if any, outstanding debt each person had. Four firearms were recovered from the trailer. A loaded .357 magnum revolver was seized from the bedroom dresser, where it was lying in a drawer on top of men's clothing. A Lorcin .380 caliber semi-automatic pistol and an Iver Johnson .22 caliber revolver were seized from a kitchen cabinet. Lastly, a .410 gauge Harrington & Richardson single shot shotgun was seized from under the bed in the bedroom.

McAuley approached the crack house seeking to purchase cocaine while the officers were executing the warrant. McAuley pointed out to the officers the bullet holes in the wall where Hamilton had shot at him. A bullet was found lodged in a window frame at the crack house. A criminalist testified that this bullet was fired from the same firearm that had fired the bullets found in the Lashley's body and underneath his body.

Although the crack house closed down after the warrants were executed, the investigation continued. On April 12, 2001, law enforcement agents listening to Courtney's wiretapped phone overheard Courtney ask Hamilton to accompany him during a sale to provide protection. During April of 2001, Hamilton brought customers to Courtney's house to purchase drugs. On April 27, 2001, Courtney called Hamilton to ask about a customer. Hamilton informed Courtney that the customer did not have money to buy drugs.

-5-

## II.

"We review the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Washington, 318 F.3d 845, 852 (8th Cir. 2003) (citation omitted). This standard of review is strict; we will uphold the verdict if there is any interpretation of the evidence that could lead a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt. United States v. Gillings, 156 F.3d 857, 860 (8th Cir. 1998).

Count I charged Hamilton with conspiracy to distribute and possess with the intent to distribute more than 500 grams of cocaine and more than 50 grams of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Hamilton contends that although the evidence supported a conclusion that he was in a buyer-seller relationship, it was insufficient to establish his involvement in the drug conspiracy. Hamilton would have us conclude that he was merely an addict who, when released from prison, rented an inexpensive trailer from Courtney and occasionally resold some of the drugs he bought from Courtney to finance his habit. The jury was properly instructed as to the difference between a buyer-seller relationship and participation in a conspiracy. When viewed in a light favorable to the verdict, the evidence was more than adequate to support a finding that Hamilton was involved in the drug conspiracy. The orderly rotation of sales among distributors, the $50 minimum sale requirement imposed by Courtney, and the large volume of sales all support a finding that Hamilton was involved in the conspiracy. See United States v. Beckman, 222 F.3d 512, 521-22 (8th Cir. 2000); United States v. Cabbell, 35 F.3d 1255, 1259 (8th Cir. 1994).

Counts II and III of the indictment charged Hamilton with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). Count II relates to the August 9, 1999, incident, and count III relates

to the August 22, 1999, shooting death of Lashley. Each count alleged sentencing enhancements pursuant to 18 U.S.C. § 3558(c), which requires a life sentence for any person who previously had been convicted of two or more serious violent felonies. Hamilton contends that in neither instance was his possession of a firearm in furtherance of the drug trafficking conspiracy charged in count I. In Hamilton's view, he could not have furthered the drug conspiracy by shooting at or killing the customers of the conspiracy. We disagree.

The term "furtherance" as used in § 924(c) should be given its plain meaning, "[t]he act of furthering, advancing, or helping forward." United States v. Lomax, 293 F.3d 701, 705 (4th Cir. 2002) (citing Webster's II New College Dictionary 454 (1999); United States v. Ceballos-Torres, 218 F.3d 409, 412 (5th Cir. 2000)). The evidence tended to show that Hamilton's shooting at his customers was intended to frighten them into returning approximately four ounces of cocaine that he believed one of them had stolen. Hamilton's actions on August 9 could reasonably be construed as serving at least two purposes that advanced the conspiracy. First, he was attempting to recover drugs that would later be sold by the conspirators. Second, by displaying the firearm and demonstrating his willingness to use it, Hamilton reduced the likelihood that these customers or others who heard about the incident would attempt to steal drugs from or otherwise infringe the turf of the conspirators. See Ceballos-Torres, 218 F.3d at 412 (listing five ways that possession of a firearm may further a drug conspiracy). Similarly, the shooting death of Lashley arose out of a dispute with Gant over Gant's failure to pay for drugs. Hamilton and Gant exchanged gunfire, and, when Hamilton thought he had shot Gant, he turned and shot Lashley so as to "leav[e] no witnesses." Eliminating a witness to a murder at the drug house could logically be seen to further the conspiracy by making it less likely that the operation would be shut down as a result of a murder investigation. Accordingly, the evidence was sufficient to support the jury's conclusion that Hamilton's possession and use of firearms during the August 9 and August 22 incidents was "in furtherance" of the drug conspiracy.

Counts IV and VI alleged that Hamilton possessed with the intent to distribute more than five grams of crack cocaine and possessed four firearms as a convicted felon. Hamilton contends that he did not knowingly possess the drugs and firearms seized during the September 9, 1999, search. Our cases establish that knowing possession may be actual or constructive. United States v. Surratt, 172 F.3d 559, 564 (8th Cir. 1999) (citation omitted). "Constructive possession . . . can be established if a person has 'ownership, dominion or control over the contraband itself, or dominion over the premises in which the contraband is concealed.'" United States v. McCracken, 110 F.3d 535, 541 (8th Cir. 1997) (citation omitted). Hamilton lived in the trailer. He paid $350 per month in rent to Courtney. Witnesses testified that they had obtained drugs from Hamilton at the trailer. Luttrell and Bialik testified that they had seen the .357 magnum revolver in close proximity to Hamilton on several occasions. The .357 magnum revolver was found in a dresser drawer on top of mens clothes. At the time, Hamilton was cohabitating with Antinette Briggs, the only other resident of the trailer. This evidence was sufficient to support the jury's finding that Hamilton possessed the drugs and the firearms seized from the trailer on September 9, 1999.

Finally, count V charged Hamilton with possession of the above-mentioned four firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). Hamilton contends that the evidence was insufficient to establish that he possessed these firearms in furtherance of a drug trafficking crime, for simultaneous possession of drugs and a firearm is not alone sufficient to support a conviction under § 924(c)(1)(A). Ceballos-Torres, 218 F.3d at 414. Evidence of a nexus between the defendant's possession of the firearm and the drug offense is required. Id. at 414-15. Courtney testified that Hamilton kept firearms in the trailer for protection. The firearms were kept in the kitchen and in the bedroom. The nearness of the firearms to the drugs and the dispersal of them throughout the trailer support an inference that the firearms were possessed so as to be readily available to protect the drugs. In addition, witnesses testified that they frequently saw the

firearms in close proximity to Hamilton during times that they purchased drugs. This evidence was sufficient to support a finding that Hamilton's possession of the firearms was in furtherance of a drug offense.

The judgment is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.