# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3561

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Victor Sanchez-Garcia, also known as | * | District of Nebraska. |
| Sergio Barraza-Ayon, also known as | * | |
| Mauricio Borjas-Madrid, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: March 14, 2006
Filed:  September 5, 2006

_____

Before ARNOLD, JOHN R. GIBSON and SMITH, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Victor Sanchez-Garcia was convicted of conspiracy to distribute and possess with intent to distribute 500 grams or more of methamphetamine, possession with intent to distribute 500 grams or more of methamphetamine, and possession of a firearm in relation to a drug trafficking offense. On appeal, he argues that there was insufficient evidence to submit the conspiracy and firearms charges to the jury and

that the district court[1] erred by finding beyond a reasonable doubt that he was previously convicted of a felony drug offense. We affirm.

In June 2003, Agent Gil Balli, a narcotics investigator with the Federal Bureau of Investigations, received a tip from a cooperating informant that an illegal alien named Mauricio Borjas, who resided at an apartment at 6761 "A" Plaza, was involved in narcotics-related activity in and around Omaha, Nebraska. The informant described the suspect as a 5'10" Hispanic male in his mid-twenties with a slim build who drove either a green compact car or a black Grand Prix or Grand Am. Balli relayed this information to Agent Ovidio De La Fuente of the Bureau of Immigration and Customs Enforcement to advise him that Borjas may be in the United States illegally and to request that De La Fuente check into the individual's immigration status.

Agent Balli and another officer set up surveillance on a black Grand Prix parked outside the suspect's apartment building. Shortly thereafter, an individual matching the suspect's description left the apartment building, got into the black Grand Prix, and drove out of the parking lot at a high rate of speed. The officers followed the suspect in their unmarked cars, and, after observing several instances of erratic driving, Agent Balli activated his lights and siren to initiate a traffic stop.

Balli approached the vehicle, displayed his badge, and identified himself in Spanish and English. Upon request, the driver produced identification, although it differed from the name that the informant had provided.[2] Speaking in Spanish, Balli told the suspect that he had reason to believe that he was in the country illegally and involved in illegal activity. The suspect agreed to cooperate with the investigation and

---

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

[2]At trial, Balli could not recall the name on the identification produced during the traffic stop.

went with Agent Balli to his unmarked police car. After again advising the suspect of the nature of the investigation, Balli requested permission to search the vehicle, as well as the suspect's apartment and the accompanying detached garage. The suspect agreed, provided Agent Balli with directions to the apartment, and identified which keys on his key ring opened the apartment and garage. A contemporaneous search of the suspect uncovered $1,135 in cash: fifty-six $20s, one $10, and one $5.

While Balli was speaking with the suspect, Agent De La Fuente arrived on the scene, having conducted a records check on Mauricio Borjas. As part of that records check, De La Fuente obtained a copy of Borjas' file, complete with a set of fingerprints, a photograph, and a list of the four different aliases Mauricio Borjas-Madrid was known to have employed. Upon his arrival at the scene, De La Fuente showed the photograph to Balli and the suspect. According to De La Fuente, the suspect "just put his head down" when he was presented with the photograph, despite previously maintaining that his name was "Victor Sanchez."

While Sanchez-Garcia was being transported to the police station, Agent Balli and several other Omaha police officers left the scene and proceeded to his apartment. There, they knocked and announced their presence and after receiving no response used Sanchez-Garcia's keys to enter the apartment and begin their search. Inside a kitchen cabinet, officers found a digital scale and a cell phone box containing approximately 886.5 grams of methamphetamine. Inside the kitchen drawers, officers found two identification cards bearing the names Jabier S. Gamez and Jose Eladio Borjas-Madrid, a Cox Communications bill addressed to Sanchez-Garcia's girlfriend, Maria Garcia, and titles to a green Ford Thunderbird LX and a black Pontiac Grand Prix. On a shelf in the bedroom closet, officers found a Hi-Point .40 caliber handgun along with a letter addressed to Maria Garcia and Mauricio Borjas Garcia. Inside a cardboard box in the detached garage belonging to the apartment, an officer found a ziplock bag containing 145.7 grams of crystal "ice" methamphetamine along with some drug packaging materials.

The handgun and the packaging materials were sent to the Douglas County crime lab to be tested for fingerprints. The investigator conducting the test was unable to recover any identifiable fingerprints from the packaging material but was able to lift a latent fingerprint from the trigger guard on the gun. The fingerprint matched that of an individual named Luis Borjas-Madrid, who the investigator learned went by several aliases, including Victor Sanchez-Garcia. Upon comparing the fingerprint cards of Luis Borjas-Madrid and Sanchez-Garcia, the investigator determined that the fingerprints were identical.

About a week after the traffic stop, De La Fuente transported Sanchez-Garcia to the immigration office for further questioning. During that interview, Sanchez-Garcia told De La Fuente that he had last entered the United States in January 2002 and had been continuously unemployed since that time. De La Fuente also took two pieces of identification from Sanchez-Garcia: a Mexican driver's license issued May 20, 2002 and a Mexican voter's card; De La Fuente observed certain irregularities with both cards and concluded that they were both counterfeit. During a follow-up investigation, Agent De La Fuente sent the fingerprint card from Borjas-Madrid's file to the Omaha Police Department's crime lab for a comparison with Sanchez-Garcia's fingerprints; the comparison showed that they were a match.

A Nebraska grand jury returned a three-count indictment charging Sanchez-Garcia with possession with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1); being an illegal alien in possession of a firearm, in violation of 18 U.S.C. 922(g)(5)(A); and criminal forfeiture pursuant to 21 U.S.C. § 853.[3] Following Sanchez-Garcia's plea of not guilty, trial commenced on October 12, 2004. At trial the government presented the

_____

[3]Later, the grand jury returned a superseding indictment, which mirrored the charges in the original indictment but contained a further factual finding that Sanchez-Garcia possessed a dangerous weapon in connection with the narcotics distribution offense.

testimony of Balli, De La Fuente, and the crime lab investigator. In addition, the government called Omaha police officer Mark Negrete, who testified about an incident in March 2003, two months before the traffic stop, when he had arrested an individual named Luis Enrique Borjas-Madrid and found approximately $4,500 in his possession, consisting of twenty-eight $100s, one $50, eighty-two $20s, two $10s, four $5s, and one $1.

The government also called Mark Langan, a retired Omaha Police sergeant with 18 years of experience in narcotics, to testify as an expert on methamphetamine distribution. According to Langan, the typical amount of methamphetamine bought for personal use was approximately one gram. He testified that the vast majority of methamphetamine entering Omaha in June 2003 was produced in "mega labs" in Mexico and then smuggled across the border by people known as "mules." Langan identified two principal forms of methamphetamine—a low purity form known as "street dope" and a high purity form known as "ice"—and then estimated that in June 2003 one gram of street dope sold for $60, while one gram of ice sold for $100 or $120. Langan testified that digital scales, large sums of cash—predominately in the form of $20 bills—packaging materials, and firearms were common to the drug trade. Lastly, he testified that drug dealers in the area often utilize a variety of tactics to avoid detection by police and being "ripped off" by other dealers, including moving frequently, using firearms, and employing multiple aliases. Having reviewed the reports in connection with Sanchez-Garcia's arrest, Langan opined that, based on the large quantities of methamphetamine, the presence of a digital scale and a firearm at the apartment, and the large amount and type of cash found on Sanchez-Garcia's person at the time of his arrests, Sanchez-Garcia was involved in the distribution of methamphetamine.

In his defense Sanchez-Garcia presented, through an interpreter, the testimony of his girlfriend, Maria Garcia, and her mother, Gloria Marin. Garcia testified that she had met the defendant, whom she knew as both Sanchez-Garcia and Mauricio Borjas-

Madrid, in October 2000, and that the couple had one child together, Mauricio Alberto Borjas Garcia. Garcia testified that she and Sanchez-Garcia, accompanied by the couple's son, made two separate trips to Mexico in late 2002 and early 2003, in order to visit family there. On each trip, Garcia and her son would reenter the United States without Sanchez-Garcia because he lacked proper documentation. Garcia's mother, who also knew Sanchez-Garcia as Mauricio Borjas, corroborated some aspects of Garcia's testimony about the trips, although the government was able to highlight a number of inconsistencies on cross-examination.

On October 18, 2004, the jury found Sanchez-Garcia guilty of being an illegal alien in possession of a firearm. However, it was unable to reach a verdict on the possession with intent to distribute charge, which led the court to declare a mistrial on that charge. Two days later, the grand jury returned a second superseding indictment charging Sanchez-Garcia with: (1) conspiracy to distribute and possess with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1); (2) possession with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1) and 846; (3) possession of a firearm in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A); and (4) criminal forfeiture pursuant to 21 U.S.C. § 853. Before the second trial, the government filed an "Information to Establish Prior Conviction" pursuant to 21 U.S.C. §851, which alleged that Sanchez-Garcia, under the name of Mauricio Borjas-Madrid, had been convicted of a felony drug offense on July 12, 2000, in the Superior Court for Maricopa County, Arizona.

The second trial commenced on May 17, 2005, during which the parties presented substantially the same evidence as the first trial, save for the testimony of Agent De La Fuente, who was not called as a witness at the second trial. The jury returned guilty verdicts on all three substantive counts, specifically finding Sanchez-Garcia responsible for 500 grams or more of methamphetamine, and the district court entered a final order on the forfeiture count. The presentence report assigned

Sanchez-Garcia an offense level of 32 with a criminal history category of III, resulting in a recommended sentencing range of 151 to 188 months. However, that range increased to 240 months to life imprisonment on account of Sanchez-Garcia's prior felony drug conviction. See 21 U.S.C. § 841(b).

Sanchez-Garcia filed objections to the presentence report, challenging his base offense level and denying the use of the various aliases the report attributed to him. He also filed a timely "Denial of Information to Establish Prior Conviction," arguing that he was not the individual convicted of the Arizona drug offense. See 21 U.S.C. § 851(c). During an evidentiary hearing on the prior conviction, the government submitted a certified copy of the prior conviction of Mauricio Borjas-Madrid. The district court compared Sanchez-Garcia with the photograph of Mauricio Borjas-Madrid from the Arizona conviction and found that the two were the same person. Finding that the government had proved Sanchez-Garcia's prior conviction beyond a reasonable doubt, the district court overruled the remainder of his objections and adopted the presentence report. The district court later sentenced Sanchez-Garcia to 240 months' imprisonment for the conspiracy charge and the possession with intent to distribute charge, each to run concurrently, and 60 months for the firearm possession charge, to run consecutively with the other terms of imprisonment. This appeal followed.

On appeal, Sanchez-Garcia first argues that there was insufficient evidence to support his conviction for conspiracy to possess with intent to distribute in excess of 500 grams of methamphetamine. "When reviewing the sufficiency of the evidence to support a conspiracy conviction, we will affirm if the record, viewed most favorably to the government, contains substantial evidence supporting the jury's verdict, which means evidence sufficient to prove the elements of the crime beyond a reasonable doubt." United States v. Lopez, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc). To convict a defendant of conspiring to distribute a controlled substance, there must be sufficient evidence that: (1) a conspiracy existed for an illegal purpose; (2)

the defendant knew of the conspiracy; and (3) the defendant knowingly joined in it. United States v. Tensley, 334 F.3d 790, 794 (8th Cir. 2003). The conspiracy's existence may be proved by direct or circumstantial evidence, although the government often relies upon the latter "due to an illegal conspiracy's 'necessary aspect of secrecy.'" Id. (quoting United States v. Robinson, 217 F.3d 560, 564 (8th Cir. 2000)). "A defendant challenging the sufficiency of the evidence in a conspiracy case has a heavy burden." United States v. Mickelson, 378 F.3d 810, 821 (8th Cir. 2004).

Sanchez-Garcia contends that there was insufficient evidence of his participation in a conspiracy to traffic in methamphetamine because there was no evidence of an agreement between him and any would-be co-conspirator. He argues that the evidence at trial established only that police recovered a digital scale and a large amount of methamphetamine in the apartment and detached garage over which he maintained control; there was no evidence that Sanchez-Garcia was involved with any other person, which he argues was required for the jury to infer that he was a participant in any conspiracy. The government responds that the evidence was sufficient for the jury to conclude that Sanchez-Garcia was engaged in a conspiracy to distribute methamphetamine, even in the absence of evidence regarding any of Sanchez-Garcia's alleged co-conspirators.

It is axiomatic that an agreement between two or more persons is the "essence" of a conspiracy. United States v. West, 15 F.3d 119, 121 (8th Cir. 1994). However, "[t]he fact that the identity of some or all other members of the conspiracy remains unknown will not preclude a conspiracy conviction." United States v. Agofsky, 20 F.3d 866, 870 (8th Cir. 1994). Indeed, "[o]ur cases have sustained conspiracy convictions when all conspirators other than the defendant were unknown so long as the government has produced evidence supporting a reasonable inference of

conspiracy." United States v. Mendoza-Gonzalez, 363 F.3d 788, 796 (8th Cir. 2004) (citing United States v. Nelson, 165 F.3d 1180, 1184 (8th Cir. 1999)).

Here, the digital scale, packaging materials, and large quantity of methamphetamine, a substantial portion of which was of the high-quality variety typically associated with resale rather than personal use, were all found in Sanchez-Garcia's apartment without any indication of methamphetamine manufacturing or personal use. These circumstances give rise to a reasonable inference that a conspiracy existed between Sanchez-Garcia and at least one unidentified seller and at least one unidentified buyer of methamphetamine. See Mendoza-Gonzalez, 363 F.3d at 796 (holding that the jury could reasonably infer existence of a conspiracy where evidence made it unlikely that the defendant grew, processed, packaged, and loaded the large quantities of drugs involved without assistance or that the drugs were intended for individual use). The reasonable inference that a conspiracy existed is further bolstered by the significant amount of cash in denominations associated with drug trafficking found on Sanchez-Garcia's person, his use of multiple aliases, and his keeping of a loaded, hi-caliber handgun in the apartment, all of which led the expert to opine that Sanchez-Garcia was involved in the distribution of methamphetamine. In addition, the evidence of Sanchez-Garcia's two trips to Mexico in the months leading up to his June 2003 arrest, the fact that although his family accompanied him to Mexico he would illegally re-enter the United States separately from his girlfriend and son, and Sgt. Langan's testimony that during the period of Sanchez-Garcia's arrest large quantities of methamphetamine in Omaha were produced in "mega labs" in Mexico and then smuggled across the border, all supported the government's theory that Sanchez-Garcia was a "mule" acting as part of a coordinated scheme to smuggle methamphetamine into the country for later distribution there.

When viewed in the light most favorable to the jury's verdict, we conclude that this was sufficient evidence from which a reasonable jury could have adopted the government's theory and concluded that Sanchez-Garcia was not working alone. The

failure to identify whom he was working with is not fatal to the government's case. See Mendoza-Gonzalez, 363 F.3d at 796; Agofsky, 20 F.3d at 870. Accordingly, we affirm the conspiracy conviction.

Sanchez-Garcia also argues that there was insufficient evidence to support his conviction for possession of a firearm in furtherance of a drug trafficking crime. To secure a conviction under § 924(c)(1)(A), the government must present evidence from which a reasonable juror could find a "nexus" between the defendant's possession of the charged firearm and the drug crime, such that this possession had the effect of "furthering, advancing or helping forward" the drug crime. United States v. Hamilton, 332 F.3d 1144, 1149-50 (8th Cir. 2003). Accordingly, evidence that the defendant simultaneously possessed drugs and a firearm, standing alone, would not warrant submitting the charge to the jury. United States v. Spencer, 439 F.3d 905, 914 (8th Cir. 2006) (quoting Hamilton, 332 F.3d at 1150)). Instead, the jury must be able to infer that the defendant's possession of the firearm facilitated the drug crime, through evidence that the firearm was used for protection, was kept near the drugs, or was in close proximity to the defendant during drug transactions. United States v. Thorpe, 447 F.3d 565, 568 (8th Cir. 2006); Spencer, 439 F.3d at 914-15.

When viewed in the light most favorable to the jury's verdict, the evidence presented at trial was sufficient to permit a reasonable juror to find the required nexus between the loaded, Hi-Point .40 caliber handgun found in Sanchez-Garcia's apartment and the drug trafficking conspiracy charged. Police found the loaded firearm in the apartment's only bedroom, which was directly adjacent to the kitchen where police found quantities of methamphetamine in excess of that associated with personal use and a digital scale of the type commonly employed in the packaging and distribution of methamphetamine. Moreover, Sgt. Langan testified as to the role of firearms in protecting drug dealers, their drugs, and their business, a role that this court has long recognized. See United States v. Espinosa, 300 F.3d 981, 984 (8th Cir. 2002). From the loaded weapon's proximity to saleable quantities of drugs and drug

packaging paraphernalia and Sgt. Langan's expert testimony regarding the use of firearms in methamphetamine trafficking, the jury could have reasonably concluded that Sanchez-Garcia kept the weapon readily accessible to protect his drugs and his drug trafficking activities, thereby facilitating the charged drug crime. This was sufficient to support his conviction under § 924(c).

With respect to his sentence, Sanchez-Garcia challenges the district court's finding beyond a reasonable doubt that he was previously convicted of a felony drug offense under the name of Mauricio Borjas-Madrid. See 21 U.S.C. § 841(b)(1)(A) (imposing heightened penalty where crime committed after previous conviction for felony drug offense). It is by now well-established that the sentencing court may, consistent with the Sixth Amendment, find both the fact of a prior conviction, as well as facts "intimately related" to that prior conviction. United States v. Carrillo-Beltran, 424 F.3d 845, 847-48 (8th Cir. 2005), cert. denied, 126 S.Ct. 1384 (2006). Whether a prior conviction under an alias is attributable to the defendant is such an "intimately related" fact. Id. at 848. Where, as here, the defendant files a timely objection to the prior conviction, the government is required to prove the existence of the prior conviction beyond a reasonable doubt. See 21 U.S.C. § 851(c). We review the district court's factual findings on the issue for clear error. Carrillo-Beltran, 424 F.3d at 847.

At a hearing on the §851 enhancement, the government offered a photograph and other identifying information for Mauricio Borjas-Madrid. The sentencing court observed that if she were restricted to comparing this photograph with the current photograph of Sanchez-Garcia included in the presentence investigation report, "there could be some question as to whether or not this is the same individual." However, because Sanchez-Garcia was present during the hearing, the court was able to conduct an in-person comparison with the photograph of Mauricio Borjas-Madrid. After doing so, the court determined that it was Sanchez-Garcia depicted in the earlier

photograph.[4]  Based on this finding, as well as the evidence presented at trial connecting Sanchez-Garcia to the alias of Mauricio Borjas-Madrid, the district court found that the government had proved beyond a reasonable doubt that Sanchez-Garcia was the individual previously convicted of a felony drug offense under the name of Mauricio Borjas-Madrid.

Without citation to authority, Sanchez-Garcia argues that the effect of the district court's in-court comparison "was to make the trial judge a fact witness" in violation of Federal Rule of Evidence 605.  This argument is without merit.  In making factual findings in support of a particular sentence, a district court may consider any evidence that has "sufficient indicia of reliability to support the conclusion that it is probably accurate." United States v. Sharpfish, 408 F.3d 507, 511 (8th Cir. 2005).  Here, the district court's visual comparison was a sufficiently reliable method for resolving the factual dispute over whether Sanchez-Garcia and Mauricio Borjas-Madrid were the same person.  Far from acting as a government witness, the district court acted as fact-finder, just as it would when observing a witness's demeanor to resolve questions regarding the witness's credibility.  Accordingly, there was no violation of Federal Rule of Evidence 605.

---

[4]In conducting its comparison, the court stated:

However, we have the defendant here in court, and I will state for the record that in looking at the defendant here in court and looking at the photograph on Exhibit 201, it frankly appears to me that unless this is a photograph of a twin brother, this is, in fact, the defendant who appears in Exhibit 201, and I believe that it is not improper for me to take judicial notice of what the defendant looks like.

(Tr. 556).

-12-

Moreover, the district court's finding beyond a reasonable doubt that Sanchez-Garcia was the individual previously convicted of a felony drug offense under the name Mauricio Borjas-Madrid was not clearly erroneous.  In addition to the in-person comparison, the district court relied on the evidence presented at trial suggesting that Sanchez-Garcia and Mauricio Borjas-Madrid were the same person.  United States v. Bledsoe, 445 F.3d 1069, 1073 (8th Cir. 2006) ("Having presided over the trial, the district court was entitled to rely on this evidence at sentencing.").  This evidence included Sanchez-Garcia's known use of the alias and the fingerprint analysis matching his fingerprints with those in the immigration file associated with Mauricio Borjas-Madrid.  See United States v. Urbina-Mejia, 450 F.3d 838, 840 (8th Cir. 2006) (holding fingerprint database sufficiently reliable for sentencing court to find that the defendant was convicted of a previous crime).  Based on this evidence, we cannot conclude that the district court committed clear error in finding beyond a reasonable doubt that Sanchez-Garcia and Mauricio Borjas-Madrid were the same person and attributing the previous felony drug conviction to Sanchez-Garcia accordingly.

The judgment of the district court is affirmed.

_____