# United States Court of Appeals
## For the Eighth Circuit

———————————————————

No. 12-1273

———————————————————

United States of America

*Plaintiff - Appellee*

v.

Viengxay Chantharath

*Defendant - Appellant*

———————————————————

No. 12-1620

———————————————————

United States of America

*Plaintiff - Appellee*

v.

Patricio Guzman-Ortiz

*Defendant - Appellant*

——————————

Appeals from United States District Court
for the District of South Dakota - Sioux Falls

——————————

Submitted: October 19, 2012
Filed: January 28, 2013
_____

Before RILEY, Chief Judge, BEAM and COLLOTON, Circuit Judges.
_____

RILEY, Chief Judge.

A jury convicted Viengxay Chantharath and Patricio Guzman-Ortiz of conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Chantharath and Guzman-Ortiz both challenge their convictions and sentences. Chantharath challenges the district court's[1] denial of his motion to suppress evidence. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.     BACKGROUND
### A.     Factual Background
#### 1.     Chantharath

In 2009, Chantharath distributed methamphetamine in Worthington, Minnesota, and Sioux Falls, South Dakota. In the summer of 2009, Chantharath "fronted"[2] Aurelio Solorio methamphetamine, which Solorio sold in order to pay Chantharath and to support Solorio's drug habit. Later, Solorio obtained larger quantities of methamphetamine directly from Mario Maldonado, Chantharath's supplier. Solorio supplied Chantharath with methamphetamine from Maldonado, and "supervise[d]" Chantharath's sales of the drugs to others. Solorio and Chantharath made multiple

---

[1]The Honorable Karen E. Schreier, then Chief Judge of the United States District Court for the District of South Dakota. The Honorable Jeffrey L. Viken has succeeded Judge Schreier as Chief Judge, effective January 1, 2013.

[2]"'"Fronting" denotes a transaction in which the buyer receives drugs on credit and repays the seller from the resale proceeds.'" United States v. Davis, 690 F.3d 912, 919 n.2 (8th Cir. 2012) (quoting United States v. Slagg, 651 F.3d 832, 841 n.3 (8th Cir. 2011)).

trips from Worthington to Sioux Falls, selling increasingly larger quantities of methamphetamine in Sioux Falls on each successive trip.

Chantharath also sold methamphetamine with Vang Somsawat, and both Chantharath and Solorio supplied methamphetamine to Jeffrey Kriz. When Kriz was arrested in the autumn of 2009, Chantharath paid for Kriz's bond and release from jail. After his release, Kriz obtained methamphetamine from Somsawat, as well as from Solorio and Chantharath.

In the summer of 2009, law enforcement officers in Sioux Falls, who were aware of Chantharath's two prior felony drug convictions, received reports of Chantharath selling methamphetamine from motel rooms in Sioux Falls. On September 28, 2009, the officers learned someone rented a motel room in Sioux Falls in Chantharath's name. The officers set up surveillance of the motel. The officers did not have a photograph of Chantharath and did not know whether Chantharath was actually in the motel room during the surveillance. The officers observed a gray Lexus, registered to Chantharath's sister, parked at the motel throughout the day.

At one point, the officers observed two women leave the motel in the Lexus and return with a male passenger. The passenger rented a motel room, although he had a Sioux Falls address. The two women made frequent trips between Chantharath's motel room and the other man's room. Later, officers stopped the women as they left the motel in the Lexus, arrested the women, and discovered $2,000 in cash, one-half ounce of marijuana, and glass test tubes and pipes in their possession.

Shortly after the women's arrest, officers at the motel observed an Asian man, later identified as Somsawat, arrive in a white van and go into Chantharath's room. A few minutes later, Somsawat and a second Asian man, later identified as Chantharath, left the room and drove away in the van. The officers followed the van. Although the officers did not observe the driver commit any traffic violations, they

stopped the vehicle to question its occupants. Responding to the officers' questions, Somsawat admitted to smoking methamphetamine in the motel room with Chantharath, and Chantharath admitted to possessing marijuana. The officers arrested and searched Chantharath, finding methamphetamine and more than $4,000.

Chantharath was released in November of 2009. After Chantharath's release, Solorio fronted methamphetamine to Chantharath, to help Chantharath "get back on his toes." On December 10, 2009, officers raided a Sioux Falls hotel room, and found Somsawat in possession of 25.6 grams of methamphetamine and $2,277. While officers were searching this hotel room, Chantharath arrived and the officers discovered in his possession 12.1 grams of methamphetamine and $1,027. The officers arrested both men.

### 2.     Guzman-Ortiz

Guzman-Ortiz was a high volume methamphetamine distributor in St. Cloud, Minnesota, and Monticello, Minnesota. Guzman-Ortiz rented a "stash house" in Monticello, which he kept for the purpose of processing, storing, packaging, distributing, and using methamphetamine. Guzman-Ortiz and his confederates processed and distributed "multiple pounds" of methamphetamine from this house.

In early 2010, Guzman-Ortiz met Sabrina Pincombe, a methamphetamine addict. During their second meeting, Guzman-Ortiz and Pincombe used drugs in a hotel in St. Cloud and at his trailer home outside of St. Cloud. Guzman-Ortiz then took Pincombe to the stash house in Monticello. At the Monticello house, Guzman-Ortiz asked Pincombe to retrieve an opaque plastic bag that Guzman-Ortiz had hidden under the hood of his vehicle. Guzman-Ortiz told Pincombe the bag contained guns. Pincombe described the item as "really heavy," but she believed the bag contained methamphetamine rather than guns.

Guzman-Ortiz met Solorio in January 2010. Solorio was using methamphetamine in the bathroom of a Minneapolis, Minnesota, nightclub when Guzman-Ortiz unexpectedly came into the bathroom. Guzman-Ortiz offered to get Solorio methamphetamine, and Solorio agreed. Later, Guzman-Ortiz invited Solorio to a hotel room in Redwood Falls, Minnesota, where Guzman-Ortiz fronted Solorio three ounces of methamphetamine. Guzman-Ortiz expected Solorio to pay him around $1,800 for the drugs at their next meeting. At their next meeting, because Solorio still had drugs from Maldonado, Solorio did not yet have the money to pay Guzman-Ortiz. Nevertheless, Guzman-Ortiz fronted Solorio another three ounces of methamphetamine.

Solorio eventually met Guzman-Ortiz in Sioux Falls and paid him around $17,500, as payment for the fronted methamphetamine and in exchange for more methamphetamine. Later that evening, Guzman-Ortiz and Solorio were driving separate vehicles to Worthington, when they were stopped by law enforcement. Guzman-Ortiz was arrested after a search of his vehicle uncovered $29,000 in cash and a scale with a white powdery residue.

On March 21, 2010, law enforcement conducted a warrant search of Guzman-Ortiz's St. Cloud apartment and the garage associated with the apartment. The officers discovered a 9-millimeter pistol in the apartment. In the garage, the officers discovered a modified AK-47 rifle with a pistol-grip. On March 25, 2010, officers in Monticello executed a search warrant at Guzman-Ortiz's stash house. This search uncovered an SKS rifle and a 9-millimeter rifle.

## B. Procedural History

A grand jury indicted Guzman-Ortiz, Chantharath, and eight additional defendants for conspiracy to distribute a controlled substance. Chantharath and Guzman-Ortiz were tried jointly before a jury.

Before trial, Chantharath moved to suppress the evidence and statements obtained as a result of the September 28 vehicle stop. The magistrate judge[3] presiding over the suppression motion held an evidentiary hearing, and the district court later adopted the report and recommendation of the magistrate judge to deny the motion. Also before trial, the government formally notified Chantharath his criminal history would subject him to a mandatory sentence enhancement if he were convicted. See 21 U.S.C. §§ 802(44), 841(b)(1)(A)(viii).

At the close of the government's case, Chantharath and Guzman-Ortiz each moved for judgment of acquittal, arguing there was insufficient evidence to convict them of conspiracy to distribute methamphetamine. The district court denied the motions. Chantharath and Guzman-Ortiz requested that the district court instruct the jury that evidence admitted against one defendant in a multi-defendant prosecution should not be considered against other defendants. The district court denied the request, reasoning all of the evidence introduced at trial was admitted against both Chantharath and Guzman-Ortiz. The jury returned a verdict of guilty as to each defendant.

At Guzman-Ortiz's sentencing hearing, the district court, over Guzman-Ortiz's objection, applied a two-level sentencing enhancement because Guzman-Ortiz possessed firearms in relation to the offense. See United States Sentencing Guidelines (U.S.S.G. or Guidelines) § 2D1.1(b)(1). The district court calculated an advisory Guidelines range of 262 to 327 months imprisonment, and sentenced Guzman-Ortiz to 262 months imprisonment. At Chantharath's sentencing hearing, the district court imposed on Chantharath a mandatory minimum sentence of life imprisonment without release, in accordance with 21 U.S.C. § 841(b)(1)(A)(viii).

---

[3]The Honorable John E. Simko, United States Magistrate Judge for the District of South Dakota.

## II.   DISCUSSION

### A.   Prejudicial Variance Claims

Chantharath and Guzman-Ortiz both argue their convictions were improper because there was a variance between the crime charged in the indictment and the evidence presented at trial. Both Chantharath and Guzman-Ortiz contend the government failed to prove they were involved in a single conspiracy to distribute methamphetamine, claiming they were involved in, at most, separate and unrelated drug conspiracies. We disagree.

A variance exists where the evidence at trial "prove[s] facts 'materially different from those alleged in the indictment.'" United States v. Wright, 540 F.3d 833, 841 (8th Cir. 2008) (quoting United States v. Whirlwind Soldier, 499 F.3d 862, 870 (8th Cir. 2007)). "When a single conspiracy is alleged in an indictment, but the proof at trial shows multiple conspiracies, there is a variance." United States v. Jones, 880 F.2d 55, 66 (8th Cir. 1989); see also United States v. Morales, 113 F.3d 116, 118-19 (8th Cir. 1997). "'A single conspiracy is composed of individuals sharing common purposes or objectives,'" United States v. Ramon-Rodriguez, 492 F.3d 930, 941 (8th Cir. 2007) (quoting United States v. Smith, 450 F.3d 856, 860 (8th Cir. 2006)), operating under "one overall agreement to commit an illegal act," United States v. Regan, 940 F.2d 1134, 1135 (8th Cir. 1991).

Whether there is a single conspiracy, or multiple conspiracies, is a question of fact for the jury. Morales, 113 F.3d at 118. We review de novo the sufficiency of the evidence supporting a conviction, "'viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict.'" Whirlwind Soldier, 499 F.3d at 869 (quoting United States v. Hamilton, 332 F.3d 1144, 1148 (8th Cir. 2003)).

The evidence was sufficient to convict both Chantharath and Guzman-Ortiz of participating in a single conspiracy. Solorio fronted drugs to Chantharath and

"supervised" Chantharath's selling of these drugs. Additional evidence supported the inference that Chantharath and Solorio agreed with others, including Somsawat and Kriz, to distribute methamphetamine supplied by Maldonado. The jury reasonably could conclude Chantharath conspired with Solorio and others to distribute methamphetamine. Likewise, the evidence supports finding Guzman-Ortiz agreed to take part in Solorio and Chantharath's distribution operation. Solorio testified Guzman-Ortiz repeatedly fronted large quantities of methamphetamine to him. This supports a reasonable inference Guzman-Ortiz agreed to include Solorio and his distribution network in Guzman-Ortiz's operation to distribute drugs. Thus, it was reasonable for the jury to determine Guzman-Ortiz and Chantharath were both involved, through Solorio, in a single overall conspiracy to distribute methamphetamine.

Chantharath and Guzman-Ortiz accurately note there is no evidence indicating they knew one another or were aware of each other's role in the conspiracy. This does not undermine the jury's finding they participated in a single conspiracy. "'[T]o be guilty of a single conspiracy, the conspirators need not know each other or be privy to the details of each enterprise comprising the conspiracy as long as the evidence is sufficient to show that each defendant possessed full knowledge of the conspiracy's general purpose and scope.'" United States v. Huggans, 650 F.3d 1210, 1222 (8th Cir. 2011) (quoting United States v. Prieskorn, 658 F.2d 631, 634 (8th Cir. 1981)). It is sufficient that the evidence proved the existence of a conspiracy to distribute methamphetamine and both Chantharath and Guzman-Ortiz "'knew of the conspiracy . . . and . . . intentionally joined the conspiracy.'" Id. (quoting United States v. Williams, 534 F.3d 980, 985 (8th Cir. 2008)). The jury in this case reasonably decided both Chantharath and Guzman-Ortiz knowingly entered into a general agreement to distribute methamphetamine with Solorio and others.

Chantharath and Guzman-Ortiz both allege a "spillover" of evidence, causing them prejudice. See United States v. Barth, 424 F.3d 752, 759-60 (8th Cir. 2005)

(discussing spillover prejudice in the context of a drug conspiracy). There can be no "spillover" prejudice if all of the evidence adduced at trial related to a single conspiracy, see id. at 759 ("A variance infringes a defendant's substantial rights when: . . . the defendant was prejudiced by a 'spillover' of evidence from one conspiracy to another.") (quoting Jones, 880 F.2d at 66), unless the danger of unfair prejudice from the evidence of a co-conspirator's acts substantially outweighed the probative value of the evidence, see United States v. Dierling, 131 F.3d 722, 730 (8th Cir. 1997) ("Acts committed in furtherance of a conspiracy are admissible as circumstantial evidence that the agreement existed unless the evidence causes 'unfair prejudice, substantially outweighing probative value' under Fed. R. Evid. 403.").[4] In this case, the danger of unfair prejudice is slight because each defendant's "participation in the conspiracy . . . is easy to identify and separate from that of the other conspirators," and the evidence is "easy to compartmentalize." Barth, 424 F.3d at 760. The district court did not err in upholding the jury's verdict in this regard.

After our de novo review, we conclude the evidence is sufficient to support the convictions.

### B.     Chantharath's Individual Claims
### 1.     Investigative Stop

Chantharath challenges the district court's denial of his motion to suppress evidence obtained as a result of the September 28 vehicle stop. We reject this argument because the officers' knowledge of Chantharath's prior drug dealing and the suspicious activity associated with Chantharath's motel room gave the officers reasonable suspicion to stop the white van and question its occupants.

---

[4]The language of Rule 403 was amended in 2011, but "[t]hese changes [were] intended to be stylistic only." Fed. R. Evid. 403 advisory committee's note to the 2011 Amendments.

We review de novo the district court's denial of a motion to suppress, accepting the underlying factual findings unless they are clearly erroneous. See United States v. Coleman, 603 F.3d 496, 498-99 (8th Cir. 2010). A vehicle stop is lawful under the Fourth Amendment if the officers have "'reasonable suspicion that the vehicle or its occupants are involved in criminal activity.'" Id. at 499 (quoting United States v. Mora-Higuera, 269 F.3d 905, 909 (8th Cir. 2001)). Officers have reasonable suspicion if they can point to "specific and articulable facts," id., giving rise to a "'particularized and objective basis for suspecting legal wrongdoing,'" id. (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). In determining whether reasonable suspicion exists, we "look at the totality of the circumstances," giving due deference to the officers' law enforcement experience and training. Id.

In the instant case, there was ample evidence to justify an investigatory stop. The officers had information Chantharath had recently been selling drugs from motel rooms in Sioux Falls. Law enforcement knew Chantharath had rented a room at the motel, and a Lexus which was linked to Chantharath was on the property. The officers knew two women who had been in the motel room and using the Lexus had been arrested with cash, drugs, and drug paraphernalia in their possession. There was good reason for the officers to suspect the white van's occupants were involved in drug activity. See id. at 500 (finding reasonable suspicion based on objective factors indicating "drug activity was afoot").

### 2.    Limiting Instruction

Chantharath argues the district court erred in failing to instruct the jury not to consider evidence concerning Guzman-Ortiz's possession of firearms when evaluating the charge against Chantharath. This argument is without merit.

Chantharath concedes our review of this claim is for plain error, because Chantharath did not request such an instruction at trial. To succeed on plain error review, "'the defendant must show: (1) an error; (2) that is plain; and (3) that affects

substantial rights.'" United States v. Rice, 699 F.3d 1043, 1049 (8th Cir. 2012) (quoting United States v. Phelps, 536 F.3d 862, 865 (8th Cir. 2008)). As previously noted, acts by Guzman-Ortiz committed in furtherance of the conspiracy are admissible against Chantharath. See Dierling, 131 F.3d at 730. Firearms are "'tools [of] the drug trade,'" United States v. Espinoza, 684 F.3d 766, 779 (8th Cir. 2012) (quoting United States v. Caballero, 420 F.3d 819, 821 (8th Cir. 2005)), so evidence that Guzman-Ortiz kept automatic weapons at his drug house and his apartment was admissible to prove Guzman-Ortiz was engaged in drug trafficking and knowingly joined in the conspiracy. Cf. United States v. Sanchez-Garcia, 461 F.3d 939, 947 (8th Cir. 2006) (reasoning the proximity of loaded guns to "saleable quantities of drugs and drug packaging paraphernalia" supports a jury's conclusion the weapons "facilitat[ed] the charged drug crime"). The district court did not plainly err.

### 3. Sentencing

Chantharath contends the district court erred in imposing a mandatory minimum life sentence under 21 U.S.C. § 851(a), violating his right to due process, because the government failed to provide proper notice of Chantharath's eligibility for a mandatory life sentence. Chantharath did not raise this objection at sentencing, so we review for plain error. See United States v. Booker, 639 F.3d 1115, 1119 (8th Cir. 2011). Because the government did all that is required under § 851(a), there was no error.

Section 851(a)(1) provides, in pertinent part:

No person who stands convicted [under 21 U.S.C. §§ 841-65] shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon.

Before trial, the government served a notice on the court and Chantharath stating the government's intent to seek an enhanced sentence under 21 U.S.C. § 841(b) and disclosed the two previous convictions supporting this enhancement.

Chantharath maintains the notice did not comply with constitutional due process requirements because the government did not specifically inform Chantharath that his prior convictions made him eligible for a mandatory life sentence under 21 U.S.C. § 841(b)(1)(a)(viii). See United States v. Johnson, 462 F.3d 815, 823 (8th Cir. 2006) ("[T]he purpose of notice under § 851 is to comply with the constitutional requirements of due process."). However, "[a]n information complies with the requirements of § 851(a) . . . as long as the information serves to convey the Government's intent to seek an enhancement based on a particular earlier conviction." United States v. Curiale, 390 F.3d 1075, 1076-77 (8th Cir. 2004). Chantharath has cited no authority suggesting a constitutional right to greater notice than what is required by § 851. It was not plain error for the district court to impose the mandatory minimum sentence under § 841(b)(1)(a)(viii).

### C.      Guzman-Ortiz's Individual Claims
#### 1.      Firearms Sentencing Enhancement

Guzman-Ortiz claims the district court erred in enhancing his sentence under U.S.S.G. § 2D1.1(b)(1) for Guzman-Ortiz's possession of a firearm in relation to the offense. We review the district court's factual finding under § 2D1.1(b)(1) for clear error. See United States v. Anderson, 618 F.3d 873, 879 (8th Cir. 2010). Because the evidence proved Guzman-Ortiz knowingly possessed firearms in connection with the conspiracy, the district court did not err.

Guzman-Ortiz challenges the district court's conclusion that he was in constructive possession of the firearms. "Constructive possession of a firearm is established when a person has dominion over the premises where the firearm is located, or control, ownership, or dominion over the firearm itself. . . . [C]onstructive

possession generally requires knowledge of an object, the ability to control it, and the intent to do so." United States v. Pazour, 609 F.3d 950, 952-53 (8th Cir. 2010). In this case, Guzman-Ortiz was the registered tenant of the Monticello house and the St. Cloud apartment where the firearms were discovered. Guzman-Ortiz also acknowledged possession of a firearm at the Monticello house when he sent Pincombe to retrieve a bag that Guzman-Ortiz claimed contained firearms. The district court did not abuse its discretion in applying the firearms enhancement.

## 2. Substantive Reasonableness of the Sentence

Guzman-Ortiz contends the district court abused its discretion in imposing a sentence at the low end of the Guidelines range. "'When we review the imposition of sentences, whether inside or outside the Guidelines range, we apply a deferential abuse-of-discretion standard.'" United States v. Feemster, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (quoting United States v. Hayes, 518 F.3d 989, 995 (8th Cir. 2008)).

> A district court abuses its discretion when it (1) "fails to consider a relevant factor that should have received significant weight"; (2) "gives significant weight to an improper or irrelevant factor"; or (3) "considers only the appropriate factors but in weighing those factors commits a clear error of judgment."

Id. (quoting United States v. Kane, 552 F.3d 748, 752 (8th Cir. 2009), vacated on other grounds by Kane v. United States, 562 U.S. ___, 131 S. Ct. 1597 (2011)). We "'may . . . apply a presumption of reasonableness'" to a within-Guidelines sentence, id. (quoting Gall v. United States, 552 U.S. 38, 51 (2007)), and we do.

At sentencing, the district court "considered all of the factors set out in [18 U.S.C. §] 3553(a)" and discussed the particular factors and characteristics that the district court believed justified the sentence. Our review of the district court's imposition of a sentence is "'narrow and deferential. . . . [I]t will be the unusual case

when we reverse a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable.'" Id. at 464 (quoting United States v. Gardellini, 545 F.3d 1089, 1090 (D.C. Cir. 2008)).  The district court did not abuse its discretion in sentencing Guzman-Ortiz at the low end of the Guidelines range.

## III.   CONCLUSION
We affirm.

_____