# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3571

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Obell Xavier Vanover, | * | |
| | * | |
| Appellant. | * | |

_____

No. 09-3599

_____

Appeals from the United States
District Court for the Southern
District of Iowa.

| | | |
|---|---|---|
| United States of America, | * | [PUBLISHED] |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Barbara Jane Vanover, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: April 13, 2010
Filed: January 13, 2011

_____

Before RILEY, Chief Judge, COLLOTON and BENTON, Circuit Judges.
_____

PER CURIAM.

Obell "Butch" Vanover and Barbara "Barb" Vanover, husband and wife, appeal their drug trafficking and firearm convictions. The Vanovers allege there is insufficient evidence to support their convictions and the district court[1] crafted an erroneous jury instruction. Butch also argues the district court erred in denying his motion to suppress. We affirm.

## I.    BACKGROUND

When viewed in the light most favorable to the jury's verdicts and accepting all reasonable inferences in support thereof, see, e.g., United States v. Bordeaux, 570 F.3d 1041, 1047 (8th Cir. 2009), the facts are these:

### A.    Detective Wagner Investigates the Vanovers

Detective Mesha Wagner serves on the Mid-Iowa Narcotics Enforcement (MINE) task force, a cooperative effort among federal, state, and local law enforcement agencies in Central Iowa. The MINE task force focuses on illegal narcotics interdiction in Des Moines and its suburbs.

In August 2007, an anonymous tipster informed Detective Wagner the Vanovers were selling and using methamphetamine in their Des Moines home. In October 2007, Detective Wagner searched the Vanovers' curbside garbage. In the Vanovers' trash, Detective Wagner found letters addressed to the Vanovers, Ziploc baggies with torn corners (so-called "corner baggies"), and a small jeweler's baggy

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

-2-

containing methamphetamine residue.  As expert witnesses would later attest at the Vanovers' trial, drug dealers commonly package small quantities of illegal narcotics in baggies similar to those found in the Vanovers' garbage.

### B.    Unrelated Investigation Leads to the Vanovers

On December 19, 2007, members of the MINE task force were conducting surveillance of Debra Dale in a then-unrelated investigation.  Law enforcement officers suspected Dale was selling methamphetamine.  One officer gave a confidential informant (CI) $540 to buy a quarter ounce of methamphetamine from Dale.  The officer also put a secret listening device on the CI.

The CI went to Dale's house and tried to buy methamphetamine from her.  Dale told the CI she needed to use the $540 to buy the methamphetamine from her supplier.  Dale took the $540, left the CI at her house, and drove away.  Law enforcement officers, including Detective Wagner, followed Dale to the Vanovers' home while the CI waited at Dale's house.

Dale went into the Vanovers' home to buy the methamphetamine.  Barb was home, but Butch was not.  Barb took Dale to the master bathroom, opened a drawer, and they discussed how much methamphetamine Dale needed.  Dale asked for a quarter ounce.  Barb took some methamphetamine, a scale, and baggies out of the drawer.  Because there was not enough methamphetamine in the drawer for the relatively large quantity Dale had requested, Barb told Dale to wait.  Barb then went to the Vanovers' garage to obtain more methamphetamine.

Shortly thereafter, Barb returned to the bathroom with another baggie of methamphetamine.  Barb sold Dale a quarter ounce of methamphetamine in a baggie for $540.  Barb then gave Dale a small "bonus" of methamphetamine in a second baggie for arranging the sale with the CI.

Dale left and drove towards her home. Several blocks away from the Vanovers' home, law enforcement officers stopped Dale for a minor traffic violation. The law enforcement officers asked Dale for permission to search her person, and Dale consented. The officers found the two baggies of methamphetamine in Dale's brassiere. Dale admitted she had just bought the methamphetamine from Barb.

## C.     Raid of the Vanovers' Home

Later that afternoon, Detective Wagner obtained a warrant to search the Vanovers' home. Around 4:50 p.m., ten MINE task force members executed the warrant. Upon arrival, they found a Hispanic man outside the Vanovers' home in a car bearing Nebraska license plates. Officers detained the man while they knocked and announced their presence. Barb answered the door and let the officers inside the home. The officers brought the man inside and assembled all persons, including a large number of children,[2] into the Vanovers' living room.

### 1.     Miranda Warnings

Around 5:00 p.m., Detective Wagner read Barb her Miranda[3] rights. Barb indicated she understood her Miranda rights and waived her right to remain silent. Detective Wagner took Barb upstairs to a bathroom and interviewed her. At first, Barb insisted there were no illegal narcotics in the home and she did not deal drugs, but admitted she used methamphetamine. Eventually, however, Barb admitted she had sold methamphetamine "in the past" and there was a small quantity of methamphetamine in one of the bathrooms. When the interview concluded, Detective Wagner brought Barb downstairs into the living room.

Butch then arrived home from work. Officers handcuffed Butch, escorted him to the living room, and sat him down on a couch next to Barb and the unidentified

[2]Barb was operating an in-home daycare.

[3]Miranda v. Arizona, 384 U.S. 436 (1966).

-4-

Hispanic man. Officer Justin Song, a MINE task force member from the Ankeny Police Department, then read <u>Miranda</u> warnings aloud to all three suspects as they sat on the couch. Butch verbally acknowledged to Officer Song that he understood his <u>Miranda</u> rights and agreed to an interview.

Deputies Lonnie Peterman and Tom Griffiths, MINE task force members from the Polk County Sheriff's Office, led Butch down to the basement where they interviewed him for about an hour. Detective Wagner came downstairs mid-interview, and Butch then admitted he had recently started selling methamphetamine and there was methamphetamine in the home. Butch insisted he did not use methamphetamine.

### 2.     Search of the Vanovers' Home

Members of the MINE task force searched the Vanovers' home. In the garage, officers found four Ziploc bags containing 119 grams of a mixture or substance containing methamphetamine. The four bags of methamphetamine were found inside a large plastic bag atop a shelf. In the basement, officers found empty Ziploc baggies with the number "1,000" written on them.

In the master bathroom, task force members found unused Ziploc baggies, a Ziploc baggie with a mixture or substance containing 6.55 grams of methamphetamine in it, and several corner baggies in the trash. Scattered around the master bedroom, officers found Barb's purse, which contained .4 grams of a mixture or substance containing methamphetamine inside a Ziploc baggie, and envelopes addressed to the Vanovers, including an utility bill addressed to Butch. Within a dresser in the master bedroom, officers found .51 grams of a mixture or substance containing methamphetamine, a digital scale, and related drug paraphernalia. In the Vanovers' bed in the master bedroom—lodged between the mattress and the box spring—officers found (1) a High Point Model C9 9 mm Luger pistol; (2) unused Ziploc baggies; and (3) four Ziploc baggies containing a total of $4,000 in cash. The High Point was fully

-5-

operational, loaded with Remington Peters 9 mm ammunition, and placed near the edge of the head of the bed. In a safe in the master bedroom, officers found a Taurus PT-22 .22 caliber pistol, .22 and .38 ammunition, 12-gauge shotgun slugs, some Ziploc baggies with white residue inside, a scale, a 100-gram weight, a small spoon, and other drug paraphernalia.

Including the methamphetamine found in Dale's brassiere, officers found a total of 142 grams of mixtures or substances containing methamphetamine attributable to the Vanovers during their investigation. The law enforcement officers never found the $540 the CI gave Dale to buy the quarter ounce of methamphetamine from Barb. Further, a fingerprint expert who examined the firearms and ammunition did not find the Vanovers' fingerprints. The expert *did* find the fingerprints of two unidentified persons on the High Point's magazine. There is no evidence either firearm had been fired. The Taurus firearm was not functional.

### D.    Prior Proceedings

In September 2008, a grand jury returned a seven-count superseding indictment against the Vanovers. Only Counts 1 through 5 are relevant to this appeal.[4] Count 1 charged the Vanovers with conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. Count 2 charged the Vanovers with distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2. Count 3 charged the Vanovers with possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), and 18 U.S.C. § 2. Count 4 charged the Vanovers with "Use or Carry [sic] a Firearm in Furtherance to [sic] a Drug Crime," in violation of 18 U.S.C. § 924(c)(1)(A)(i). Count 5 charged

_____

[4]Count 6 charged Butch with witness tampering, in violation of 18 U.S.C. § 1512(b)(1). After four hours of deliberations, the jury announced it was "deadlocked" on Count 6, but had reached verdicts as to the remaining counts. The district court declared a mistrial as to Count 6 only, and the government has declined to retry that count. Count 7 was a forfeiture provision.

Butch with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

In June 2009, the district court held a three-day jury trial on the superseding indictment. The jury found the Vanovers guilty as charged in Counts 1 through 5. In response to a series of interrogatories, the jury also found the Vanovers conspired to distribute, distributed, and possessed with intent to distribute "at least 50 grams of a mixture and substance containing methamphetamine."

The district court sentenced Butch to 420 months of imprisonment and Barb to 181 months of imprisonment. The Vanovers appeal.

## II.    DISCUSSION

Before our court are six issues, which fall into three categories. The first category consists of Butch's arguments concerning the denial of his motion to suppress. The second category includes the Vanovers' arguments regarding the sufficiency of the evidence to support their various convictions on Counts 1 through 5. The third category is comprised of the Vanovers' arguments about the district court's marshalling instruction for Count 4.

### A.    Motion to Suppress
### 1.    Standard of Review

Our standard of review is narrow with respect to Butch's appeal of the denial of his motion to suppress. Although we review the district court's ultimate legal conclusions de novo, we review the district court's factual findings for clear error. See United States v. Ingram, 594 F.3d 972, 976 (8th Cir. 2010). We "will affirm the district court's denial of a motion to suppress evidence unless it is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, based on the entire record, it is clear a mistake was made." United States v. Munoz, 590

F.3d 916, 920 (8th Cir. 2010) (quoting United States v. Hogan, 539 F.3d 916, 921 (8th Cir. 2008)).

### 2. Legal Framework

In Miranda, the Supreme Court created prophylactic procedural rules that must be followed before a custodial interrogation commences to ensure the Fifth Amendment's mandate that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V. See Miranda, 384 U.S. at 444. The Supreme Court held a suspect in custody "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. In general, any statements elicited from a suspect in violation of these rules are inadmissible in the government's case-in-chief. See Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam). Further, in order for a confession obtained during a custodial interrogation to be admissible at trial, the government must show the defendant knowingly, voluntarily, and intelligently waived his Miranda rights. See Miranda, 384 U.S. at 479.

### 3. Analysis

#### i. First Issue: Did Detective Song read Butch his Miranda rights?

Butch argues the district court clearly erred in finding Detective Song read Butch his Miranda rights and, as a consequence, should have suppressed the incriminating statements Butch made in the basement. Butch highlights various minor inconsistencies in the law enforcement officers' testimony at his suppression hearing. Butch lodges a credibility challenge, opining the district court should have (1) credited Butch's testimony that no law enforcement officer read Miranda rights to him; (2) credited Barb's testimony that she never saw Butch until after he came out of the basement; and (3) discredited the law enforcement officers' testimony that Detective Song read the Miranda warnings to Butch.

Butch's argument is not well taken. "A credibility determination made by a district court after a hearing on the merits of a motion to suppress is 'virtually unassailable on appeal.'" United States v. Frencher, 503 F.3d 701, 701 (8th Cir. 2007) (quoting United States v. Guel-Contreras, 468 F.3d 517, 521 (8th Cir. 2006)). We do not detect clear error in the district court's credibility findings. The district court was forced to choose between the testimony of the Vanovers or the law enforcement officers, and the district court credited the testimony of the officers.

Substantial evidence supports the district court's finding that Detective Song read Butch his Miranda rights. Detective Song and Deputy Peterman each testified Detective Song read Butch his Miranda rights in the Vanovers' living room and Butch then acknowledged he understood such rights. On cross-examination, Deputy Peterman emphatically stated, "There's no question in my mind that it occurred because I was there." While there were some inconsistencies among the officers' stories—especially regarding the timing and sequence of the events inside the Vanovers' home during the execution of the search warrant—the district court noted these inconsistencies in a thoroughly written order. The district court aptly pointed out (1) the officers, as professionals experienced with high-stress environments, would ordinarily remember the facts better than nervous suspects; (2) Miranda warnings are routine; and (3) the officers had less incentive to lie than the Vanovers.

### ii. Second Issue: Did the district court err in finding Butch waived his Miranda rights?

Butch opines "there was certainly police coercion" in his interrogation and concludes the district court erred in finding he voluntarily, knowingly, and intelligently waived his Miranda rights. Butch argues his statements do not pass muster under 18 U.S.C. § 3501(b), which purports to set forth factors a finder of fact should consider when deciding whether a Miranda waiver is valid. Section 3501(b) provides:

The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession . . . , (2) whether such defendant knew the nature of the offense . . . of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel, and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

In accordance with the implicit assumption of the parties, we assume without deciding the district court was required to weigh the § 3501(b) factors. Cf. Dickerson v. United States, 530 U.S. 428, 431 (2000) (discussing § 3501(b) and stating "Miranda and its progeny . . . govern the admissibility of statements made during custodial interrogation"). Even so, the district court did not clearly err when it found Butch voluntarily, knowingly, and intelligently waived his Miranda rights. Once again, Butch attacks the district court's credibility findings even though such findings are "'virtually unassailable on appeal.'" Frencher, 503 F.3d at 701 (quoting Guel-Contreras, 468 F.3d at 521). For example, Butch points us to his own testimony that (1) Detective Griffiths told Butch, "if you talk to me, I can probably help you out"; (2) Detective Song did not read Butch the Miranda warnings; and (3) Butch was cowed into confessing because he lacked experience with interrogations.

The district court did not credit Butch's testimony, and the court's credibility findings were not clearly erroneous. Detective Wagner testified she never promised Butch any type of leniency or threatened him. Deputy Peterman and Deputy Griffiths

-10-

testified no one made any promises of leniency to Butch. When asked whether he made such a promise, Deputy Griffiths stated:

> [A]bsolutely not. I never make that type of a statement to anybody. I'm not a judge. I'm not an attorney. I'm a police officer. I can't make promises like that to anyone.

It is undisputed Butch has a long criminal history and is not unfamiliar with law enforcement officers. Further, as the district court recognized, Butch admitted Detective Griffiths told him before the interrogation that he "was in trouble for the guns and drugs that were found" in the house. Butch thus knew the nature of the subject offenses.

Under the totality of the circumstances, there is substantial evidence to support the district court's finding that Butch voluntarily, knowingly, and intelligently waived his Miranda rights. The officers holstered their firearms after securing the premises; no one raised their voices or argued; Butch was not under the influence of alcohol or any narcotics; and the officers wore plain clothes. Although handcuffed and without counsel during the interview, Butch was in his own home. Deputy Peterman testified Butch was "calm, nice, pleasant, concerned." Detective Wagner testified Butch was "very calm" and there was no tension or conflict in the air. Officer Song testified "[t]here wasn't anything specific about [Butch's] demeanor that would indicate . . . he was under any kind of emotional distress." Deputy Griffiths testified Butch was "relaxed." Interestingly, Butch knew Deputy Griffiths from their days selling cars together at a Des Moines car dealership in the 1970s. Deputy Griffiths knew Butch well enough to call him "Butch" and not "Obell." Butch replied, "hi, Tom."

The record adequately reflects the officers gave Butch Miranda warnings, and Butch waived his rights by thereafter answering the officers' questions.

-11-

**B. Sufficiency of the Evidence**

**1. Legal Standard**

With respect to the Vanovers' various sufficiency of the evidence arguments, we view the evidence in the light most favorable to the jury's verdicts, draw all reasonable inferences in favor of those verdicts, and reverse "only if no reasonable jury could have found [the Vanovers] guilty beyond a reasonable doubt." United States v. Butler, 594 F.3d 955, 964 (8th Cir. 2010). "[O]ur role is not to reweigh the evidence or to test the credibility of the witnesses," because "'[q]uestions of credibility are the province of the jury.'" United States v. Dugan, 238 F.3d 1041, 1045 (8th Cir. 2001) (quoting United States v. Chavez, 230 F.3d 1089, 1091 (8th Cir. 2000)).

**2. Analysis**

**i. Third Issue: Is there sufficient evidence to support Butch's drug trafficking convictions?**

Butch appears to concede, if the district court did not err in failing to suppress his incriminating statements, sufficient evidence supports his drug trafficking convictions. Because the district court did not err in denying suppression, Butch's sufficiency argument is a non-starter.

In any event, sufficient evidence supports Butch's drug trafficking convictions on Counts 1, 2, and 3. See 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 841(b)(1)(C), and 846. Even if we ignore Butch's incriminating statements in the basement—arguably explicit confessions to distribution of methamphetamine and possession with intent to distribute methamphetamine—other evidence in the record is sufficient to establish Butch's guilt.[5] Butch's home was filled with indicia of drug dealing, including a

_____

[5]In his closing argument to the jury, Butch's attorney conceded Butch was selling methamphetamine at the time of his arrest. Butch's attorney only argued the government had not established the drug quantities alleged in the superseding indictment. In Counts 1 and 3, the government alleged Butch was responsible for at

relatively large quantity of methamphetamine, weapons, drug paraphernalia, and $4,000 in cash. Detective Griffiths explained methamphetamine is a powerful narcotic and 142 grams of a mixture or substance containing methamphetamine is "definitely" a distribution amount. Detective Griffiths described how firearms, Ziploc baggies, scales, and the other paraphernalia further the drug trade. Dale testified she and her husband bought methamphetamine from the Vanovers at least fifty times between 2005 and 2007, in amounts ranging from a quarter of a gram (in exchange for $20-$25), a gram ($80-$100), and a quarter of an ounce ($250-$540).[6]

Dale characterized the Vanovers as working together to sell their methamphetamine. For example, immediately before the methamphetamine sale resulting in their arrests, Butch made arrangements over the telephone for Dale to buy methamphetamine from Barb. Dale testified the Vanovers' methamphetamine business was so successful that, on several occasions, Dale had to wait in line behind as many as five to ten other methamphetamine buyers at the Vanovers' home. Onterio Taylor testified, while incarcerated with Butch after Butch's arrest, Butch admitted arranging the methamphetamine sale to Dale and told Taylor the unidentified Hispanic man was Butch's supplier. The Hispanic man had fronted Butch the methamphetamine, and had come to the Vanovers' home to collect $4,000—the exact amount of cash found underneath the Vanovers' mattress.

Although Butch contends Dale's testimony was untrustworthy because, among other things, (1) she is a confessed methamphetamine addict; (2) she was not cooperating with the MINE task force on December 19, 2007; and (3) law

least 50 grams of a mixture or substance containing methamphetamine.

[6]Dale reported the Vanovers sometimes accepted clothing, jewelry, furniture, and other merchandise in lieu of cash. Dale explained she and her husband went "curbing over in the rich area" of Des Moines and picked up abandoned garbage items to later trade to the Vanovers for methamphetamine.

enforcement officers never recovered the $540, the jury apparently found Dale's testimony to be credible. We will not disturb the jury's verdicts. See Dugan, 238 F.3d at 1045 (leaving credibility questions for the jury); see also United States v. Gaona-Lopez, 408 F.3d 500, 505 (8th Cir. 2005) ("[W]e do not sit as [a] second jury, and we are completely [u]nwilling to usurp the jury's unique role in judging the credibility of witnesses. The jury is free to believe the testimony of any witness in its entirety, or to reject that testimony as untrustworthy." (quotations omitted)).

### ii. Fourth Issue: Is there sufficient evidence to support Butch's felon in possession of a firearm conviction?

Sufficient evidence supports Butch's felon in possession of a firearm conviction. To convict Butch under 18 U.S.C. § 922(g)(1), as set forth in Count 5, the government was required to prove: "'(1) [Butch] had previously been convicted of a crime punishable by a term of imprisonment exceeding one year; (2) [Butch] knowingly possessed a firearm; [and] (3) the firearm [was] in or . . . affected interstate commerce.'" United States v. Claybourne, 415 F.3d 790, 795 (8th Cir. 2005) (quoting United States v. Maxwell, 363 F.3d 815, 818 (8th Cir. 2004)). Butch only challenges the second element.

In denying Butch's motion for judgment of acquittal, the district court observed "[t]he case is a little thin on the knowledge" element, but held a reasonable jury could find Butch knowingly possessed the High Point underneath his mattress. The district court did not err. It is not fatal that, as Butch stresses, there is no *direct* evidence he possessed the firearm, because proof of joint constructive possession is sufficient to sustain a conviction under § 922(g)(1). Id. "'Constructive possession . . . is established if the person has dominion over the premises where the firearm is located, or control, ownership, or dominion over the firearm itself.'" Id. at 795-96 (quoting United States v. Boykin, 986 F.2d 270, 274 (8th Cir. 1993)).

-14-

Here, a reasonable jury could find Butch knowingly possessed the High Point with Barb jointly under a constructive possession theory: (1) Butch lived in the home in which the firearm was found; (2) Butch slept on the bed in which the firearm was hidden; (3) documents addressed to Butch were found in the same bedroom as the firearm; and (4) Butch admitted to Taylor he owed $4,000 to his methamphetamine supplier, and the firearm was hidden next to $4,000 in cash. As Detective Griffiths testified at trial, drug dealers commonly use firearms for intimidation and protection. Butch, a confessed drug dealer, was more likely to possess a firearm and, as a consequence, use a firearm to protect his methamphetamine, cash, and family. See, e.g., Boykin, 986 F.2d at 274 (holding there was sufficient evidence to support § 922(g)(1) conviction, where firearms were seized in the defendant's master bedroom, including one between the mattress and box spring, a room the defendant shared with his wife).

### iii. Fifth Issue: Is there sufficient evidence to support the Vanovers' convictions for possessing a firearm in furtherance of a drug trafficking crime?

Butch and Barb each argue the evidence was insufficient to support their § 924(c) convictions. Count 4 alleged Butch and Barb "knowingly and intentionally possess[ed] one or more firearms, including [the] High Point . . . and ammunition, in furtherance of to [sic] [the] drug trafficking crime[s set forth in Counts 1 through 3]."[7]

> "To secure a conviction under [18 U.S.C.] § 924(c)(1)(A), the government must present evidence from which a reasonable juror could find a 'nexus' between the defendant's possession of the charged firearm and the drug crime, such that this possession had the effect of 'furthering, advancing or helping forward' the drug crime." United

---

[7]Count 4 also charged Butch and Barb with possessing the Taurus in furtherance of felony drug trafficking crimes, but the district court dismissed such allegations at the conclusion of the government's case-in-chief because it was undisputed the Taurus was not functional.

States v. Sanchez-Garcia, 461 F.3d 939, 946 (8th Cir. 2006) (citation omitted). "Accordingly, evidence that the defendant simultaneously possessed drugs and a firearm, standing alone, would not warrant submitting the charge to the jury." Id. (citation omitted). "Instead, the jury must be able to infer that the defendant's possession of the firearm facilitated the drug crime, through evidence that the firearm was used for protection, was kept near the drugs, or was in close proximity to the defendant during drug transactions." Id. at 946-47 (citation omitted).

United States v. Rush-Richardson, 574 F.3d 906, 909 (8th Cir. 2009).

Sufficient evidence exists from which a reasonable jury could find the Vanovers each, "in furtherance of [a felony drug trafficking crime], possesse[d]" the High Point. 18 U.S.C. § 924(c)(1)(A). As previously indicated, sufficient evidence shows Butch constructively possessed the firearm jointly with Barb. The same analysis applies with equal, if not greater, force to Barb. Barb lived in the same home as Butch and slept in the same bed, and mail addressed to Barb was found near the High Point. Barb also sold Dale methamphetamine in an adjoining bathroom next to the concealed firearm, and admitted she knew about the High Point.

The remaining element is whether there is sufficient evidence from which a reasonable jury could find the Vanovers each possessed the High Point *in furtherance of* a drug trafficking crime. The evidence is sufficient. As we have repeatedly recognized—and as an expert witness testified at the Vanovers' trial—drug dealers such as the Vanovers often use firearms for personal protection, intimidation, and to safeguard drugs and cash. See, e.g., Boykin, 986 F.2d at 274. Here, the High Point was placed underneath a mattress in close proximity to a large quantity of cash and packaging materials and in the same room as methamphetamine, ammunition, and drug paraphernalia. The High Point was placed near the edge of the bed for easy access. In other cases, we have found sufficient evidence to support § 924(c) convictions under less damning circumstances. See, e.g., Rush-Richardson, 574 F.3d at 910 (holding sufficient evidence supported a § 924(c) conviction, where the

defendant resided in the home in which firearms were found "in a closet in the bedroom across the hallway from [the defendant's] bedroom where cocaine was found" and "in the kitchen, fifteen to twenty feet away from the bedrooms, with drug trafficking paraphernalia and a baggie with cocaine residue"); United States v. Sanchez-Garcia, 461 F.3d 939, 942-44, 946-47 (8th Cir. 2006) (holding there was sufficient evidence to support a § 924(c) conviction, where the firearm was identified to be the defendant's, an expert witness testified to the link between drug dealing and firearms, and "saleable quantities of drugs and drug packaging paraphernalia" were found in a kitchen adjacent to a bedroom where the firearm was found on a closet shelf). The evidence is even stronger with respect to Barb, because Dale testified that Barb sold Dale methamphetamine in the adjacent master bathroom.

### C.    Jury Instruction
#### 1.    Standard of Review

The Vanovers criticize the district court's use of Instruction 20. Because the Vanovers did not object to this instruction in the district court, we review only for plain error. See Rush-Richardson, 574 F.3d at 910. To show plain error, the Vanovers must establish

> (1) there is an "error"; (2) the error is "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected [the Vanovers'] substantial rights, which in the ordinary case means" it "affected the outcome of the district court proceedings"; and (4) "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

United States v. Marcus, 130 S. Ct. 2159, 2164 (2010) (quoting Puckett v. United States, 129 S. Ct. 1423, 1429 (2009)). With respect to the third element, an error only affects substantial rights if it is prejudicial, i.e., the defendant proves there is "a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." United States v. Dominguez Benitez, 542 U.S. 74, 82

(2004) (quotation omitted). The Vanovers must "satisfy the judgment of the reviewing court, informed by the entire record, that the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding." Id. at 83 (quotation omitted).

### 2. Sixth Issue: Does Instruction 20 require reversal?

Under 18 U.S.C. § 924(c)(1)(A), a defendant is subject to a mandatory minimum five-year sentence of imprisonment if he or she (1) used or carried a firearm "during and in relation to" a drug trafficking crime or (2) possessed a firearm "in furtherance of" a drug trafficking crime. The superseding indictment charged the Vanovers under the second prong of § 924(c).

In Instruction 20 – tracking Eighth Circuit Model Criminal Jury Instruction 6.18.924C (2007), which was later amended – the district court defined "in furtherance of" as follows:

> The phrase "possessed in furtherance of" means the firearm must have some purpose or effect with respect to the crime of conspiracy to distribute methamphetamine, distribution of methamphetamine or possession of methamphetamine with the intent to distribute; its presence or involvement cannot be the result of accident or coincidence. The firearm must facilitate or have the potential to facilitate the offense of conspiracy to distribute methamphetamine, distribution of methamphetamine or possession of methamphetamine with the intent to distribute[.]

In United States v. Kent, 531 F.3d 642 (8th Cir. 2008), we concluded that a materially similar instruction was erroneous. We reasoned that such a definition of "possession in furtherance of" was almost identical to the Supreme Court's definition of "in relation to." Id. at 654-55. Because this court had concluded in a prior case that "in furtherance of" is a slightly higher level of participation than "during and in relation to," see United States v. Gamboa, 439 F.3d 796, 810 (8th Cir. 2006), we

-18-

concluded that an instruction modeled on Eighth Circuit Model Criminal Jury Instruction 6.18.924C (2007) was erroneous because it "would allow the jury to convict on the lesser finding of 'in relation to.'" 531 F.3d at 655. We nonetheless affirmed the conviction, because the defendant did not challenge the jury instruction in the district court *or on appeal*, and leaving the conviction in place under those circumstances would not seriously affect the fairness, integrity or public reputation of judicial proceedings. Id. at 656-57. It was unnecessary for the Kent opinion to decide whether the error affected the defendant's substantial rights, a question that the panel thought was "close." Id. at 656. (A later decision that cites this *dictum* in reaching a holding *in the subsequent decision*, see Rush-Richardson, 574 F.3d at 912, does not convert the *dictum* in Kent to a holding in Kent. Kent was decided on the fourth prong of plain-error analysis, plain and simple. Cf. post at 22-23.)

Since then, we have decided four more cases involving similar erroneous jury instructions based on the former model instruction for § 924(c). In each case, the defendant failed to object at trial, but raised the error on appeal, and we considered the instruction under a plain-error standard of review. In two cases, we reversed convictions, holding that the erroneous instruction affected the defendant's substantial rights and that the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. Rush-Richardson, 574 F.3d at 910-13; United States v. Brown, 560 F.3d 754, 766-68 (8th Cir. 2009). In two more recent decisions, we held that the erroneous jury instruction did not affect the substantial rights of the defendant, given the strength of the evidence in those cases and the narrow circumstances in which a firearm would be possessed "during and in relation to" drug trafficking but not "in furtherance of" drug trafficking. United States v. Mashek, 606 F.3d 922, 931-32 (8th Cir. 2010); United States v. Coleman, 603 F.3d 496, 501-02 (8th Cir. 2010). While the concurring opinion finds it "not surprising" that these precedents are "irreconcilable," and characterizes them as "a tangle of conflicting prior panel opinions," post at 28, we believe they can and should be harmonized. The Mashek and Coleman panels both discussed Rush-Richardson, which in turn discussed Brown,

and we presume that the later panels followed the prior panel rule in good faith. Where, as here, there is a reasonable basis to reconcile decisions that have come before, that is the proper course for a panel of a multi-member court.

We think the evidence against the Vanovers is comparable to the evidence in Mashek and Coleman, and that the error in this case did not affect the substantial rights of the Vanovers. In Mashek, police found loaded firearms in the defendant's house in the same room with methamphetamine manufacturing equipment and surveillance equipment. 606 F.3d at 932. In Coleman, police seized a loaded firearm and distribution quantities of cocaine and ecstasy from a glove box directly in front of the defendant in a vehicle. 603 F.3d at 501. In this case, police found a loaded High Point pistol under a mattress in the Vanovers' bedroom, positioned near the edge of the bed for easy access, in the same room with a saleable quantity of drugs, $4000 in cash, packaging materials, a scale, and other drug paraphernalia, and adjacent to a room in which Barbara sold methamphetamine. Under those circumstances, we see no reasonable probability that the outcome would have been different if the jury had been instructed correctly on the meaning of "in furtherance."

The evidence here is stronger than in Rush-Richardson and Brown, where we held that a comparable instructional error affected a defendant's substantial rights. In Rush-Richardson, the seized firearms were located in different rooms from measurable quantities of drugs – one in a bag in a bedroom closet and two others in a bag on top of kitchen cabinets. 574 F.3d at 912. (The opinion in Rush-Richardson made much of the absence of fingerprints on the firearms, id., but none of these five cases involved evidence of the defendant's fingerprints, so the point is immaterial when comparing the cases.) In Brown, one seized firearm was found along with a large amount of cash and a scale in a vehicle belonging to the defendant, but the gun and vehicle were stored at a warehouse, there is no indication that the gun was loaded, and the only controlled substance found in the vicinity was a small amount of marijuana. 560 F.3d at 761. Another firearm was found with 35 pounds of marijuana,

a bullet proof vest and ammunition, but this gun was located in a storage unit rented by a co-conspirator, rather than by the defendant, and there is no indication that it was loaded.[8] Id. The inference that the defendant in Brown possessed these firearms "in furtherance of" a drug trafficking offense, while strong enough to convince some that the instructional error should have been deemed harmless, see post at 24-25, was not as powerful as the inference in this case, where the defendants kept a loaded and readily-accessible pistol in their bedroom with saleable drugs, drug trafficking material, and a substantial amount of cash. We therefore conclude that the Vanovers have failed to demonstrate a plain error warranting relief.

## III.  CONCLUSION

The judgment of the district court is affirmed.

RILEY, Chief Judge, concurring in part and concurring in the judgment.

I respectfully disagree with the majority's analysis of the sixth issue. The majority sidesteps United States v. Kent, 531 F.3d 642 (8th Cir. 2008), rewrites

---

[8]Despite the government's obvious incentive to highlight evidence of a loaded firearm in a § 924(c) prosecution, the government's brief in Brown never asserted that these firearms were loaded, while it did report that a different count of conviction involved a "loaded .357 Magnum firearm." See Brief of Appellee at 16, 32, 44, Brown, 560 F.3d 754 (Nos. 08-1378, 08-1384, and 08-1385). The issue here, moreover, is not whether the panel in Brown thought it important that the firearms were loaded or unloaded, cf. post at 24-25, but whether subsequent panels may legitimately view that factor as a basis for distinguishing Brown from a case in which loaded firearms strengthen the argument for harmlessness. The concurrence ironically asserts that our comparison of the facts of these cases is "inconsistent with the traditional principles of stare decisis underlying our common law jurisprudence," post at 25, while at the same time charging that we follow what Karl Llewellyn described as "the orthodox doctrine of precedent." K. Llewellyn, The Bramble Bush on Our Law and Its Study 72 (1960).

United States v. Brown, 560 F.3d 754 (8th Cir. 2009), and ignores much of United States v. Rush-Richardson, 574 F.3d 906 (8th Cir. 2009).

## I.    Majority's Analysis

### A.    <u>Kent</u>

The majority does not recount the facts of <u>Kent</u>, saying "[i]t was unnecessary for the <u>Kent</u> opinion to decide whether the error affected the defendant's substantial rights, a question that the panel thought was 'close.'"  <u>Ante</u> at 19.  The majority implies the facts of <u>Kent</u> are irrelevant to the case before us.  I disagree.

The defendant in <u>Kent</u> was arrested with two bags of crack cocaine and a firearm on his person.  See <u>Kent</u>, 531 F.3d at 647.  A loaded firearm, cash, crack cocaine, and men's clothing were later found in Kent's 16-year-old girlfriend's bedroom.  <u>Id.</u>  In dicta, the <u>Kent</u> court opined it was "a close question" whether the defendant had proven sufficient prejudice to warrant plain-error relief.  <u>Id.</u> at 656 (Benton, J., author).

For the reasons set forth in Part II.B. below, I believe <u>Kent</u>'s "close question" statement was ill-considered.  Subsequent panels "might have gone in a different direction" and declined to adopt <u>Kent</u>'s dicta as precedent.  See <u>Rush-Richardson</u>, 574 F.3d at 913 (Colloton, J., concurring).  See also <u>Passmore v. Astrue</u>, 533 F.3d 658, 661 (8th Cir. 2008) (noting a panel need not follow dicta, defined as "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential").  But that is not what happened. What began as <u>Kent</u>'s "close question" dictum became the law of the circuit, a polestar in the prejudice determination.  See, e.g., <u>Rush-Richardson</u>, 574 F.3d at 912 (majority opinion) ("The evidence here is relatively weaker . . . compared to the evidence presented in <u>Kent</u>, where we said the evidence presented a 'close question'

-22-

. . . . Thus, . . . we are convinced, in light of our statement in <u>Kent</u> and our holding in <u>Brown</u>, the evidence in Rush-Richardson's case suggests Rush-Richardson's substantial rights were affected.").[9]  The majority effectively strips <u>Kent</u> of its precedential force.  <u>See</u> <u>Drake v. Scott</u>, 812 F.2d 395, 400 (8th Cir. 1987) ("One panel of this Court is not at liberty to disregard a precedent handed down by another panel.").  <u>See</u> <u>also</u> <u>Eisner v. Macomber</u>, 252 U.S. 189, 205 (1920) ("And what we have quoted from the opinion in that case cannot be regarded as obiter dictum, it having furnished the entire basis for the conclusion reached."); <u>Darr v. Burford</u>, 339 U.S. 200, 225-26 (1950) (Frankfurter, J., dissenting) ("The disclosure of the reasoning by which a conclusion is reached cannot remotely be deemed dictum.  A decision implies the process of reasoning which requires it.").

If it was a "close question" whether the defendant in <u>Kent</u> suffered prejudice, then there is prejudice warranting plain-error relief in the case at bar.  Although the evidence against the Vanovers is strong, neither Barb nor Butch was caught as "red handed" as the defendant in <u>Kent</u>, who was caught with a firearm and distribution-quantity drugs on his person.[10]

_____

[9]The <u>Rush-Richardson</u> panel was unanimous on this point.  <u>See</u> <u>Rush-Richardson</u>, 574 F.3d at 913 (Colloton, J., concurring) ("If a comparable instruction created a 'close' question . . . in <u>Kent</u>, and crossed the threshold in <u>Brown</u> . . . then it seems to follow that Rush-Richardson's substantial rights were affected . . . .  Our cases might have gone in a different direction . . . but I ultimately agree with the disposition of this case in light of <u>Brown</u> and <u>Kent</u>.").

[10]In <u>Weems v. United States</u>, 217 U.S. 349, 362 (1910), the Supreme Court held the plain-error "rule is not altogether controlled by precedent," but "confers a discretion that may be exercised at any time, no matter what may have been done at some other time."  <u>See</u> <u>also</u> 21 C.J.S. <u>Courts</u> § 207 ("[T]he discretionary decision of an appellate panel to notice plain error is totally ad hoc, and a decision by one particular panel on one particular occasion to do so is not binding on subsequent panels, even when similar subject matter seems involved.").  The majority's unstated premise that stare decisis applies in the plain-error context seems doubtful in light of

-23-

**B.  Brown**

In Brown, a .38 caliber revolver, ammunition, a scale, $16,000 in cash, and a small amount of marijuana were seized from the defendant's vehicle stored at a warehouse.  See Brown, 560 F.3d at 761.  A semi-automatic rifle, ammunition, and 35 pounds of marijuana were found in a storage unit leased by one of the defendant's co-conspirators.  Id. at 767-68.  The Brown court reasoned the "evidence might support a finding that Brown *possessed* these firearms, but . . . would not support a finding that Brown *used or carried* them."  Id. at 768 (emphasis in original).  Brown concluded the defendant's substantial rights were affected and reversed.  See id.

It strains reason to conclude the evidence on the "in furtherance of" element of the Vanovers' § 924(c)(1)(A) convictions is materially stronger than the evidence discussed in Brown, such that reversal was warranted in Brown, but not here.  This is not to say I agree with Brown, or that I am able to reconcile Brown with some of our most recent cases in this area of the law.  See infra Part II.A.  My point is, if reversal was appropriate in Brown, then reversal probably is appropriate here.

The majority attempts to distinguish Brown on its facts, averring that the presence of a tight nexus among a loaded firearm, distribution-quantity drugs, and each defendant tips the balance in the case at bar toward affirmance.  The majority emphasizes "there is no indication" the two firearms at issue in Brown were loaded.  Ante at 20.  On the other hand, there is no indication the two firearms in Brown were unloaded either.

_____

Weems.  For present purposes, however, I assume, as does the majority, that precedent controls our decision to grant or deny plain-error relief.  If our review were totally ad hoc, I would deny plain error relief for the reasons stated in Part II.B. below.

-24-

Neither the <u>Brown</u> court, the parties, the witnesses, nor the district court made any mention of whether the firearms were loaded or unloaded in that case. Because the loaded or unloaded state of the firearms was a question the <u>Brown</u> court left open, it could not have been relevant to its holding. The parties and lawyers in <u>Brown</u> may be surprised to learn an outcome-determinative factor in their case was the absence of any indication in the record that the firearms were loaded.

The majority's analysis, which recasts <u>Brown</u>'s holding by answering an unasked question about that case, is inconsistent with the traditional principles of stare decisis underlying our common law jurisprudence. <u>See</u> <u>Cooper Indus., Inc. v. Aviall Servs., Inc.</u>, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (quoting <u>Webster v. Fall</u>, 266 U.S. 507, 511 (1925)). In effect, the majority overrules <u>Brown</u>, adhering to the logic of K.N. Llewellyn, <u>The Bramble Bush</u> 63 (1930) ("Every case lays down a rule, the rule of the case. The express *ratio decidendi* is prima facie the rule of the case, since it is the ground upon which the court chose to rest its decision. But a later court can reexamine the case and . . . through examination of the facts . . . narrow the picture of what was actually before the court and can hold that the ruling made requires to be understood as thus restricted. . . . And when you find this said of a past case you know that in effect it has been overruled."). I do not agree with <u>Brown</u>, but I cannot distinguish it.[11]

---

[11]The majority says "there is a reasonable basis [here] to reconcile [these] decisions," which "is the proper course for a panel of a multi-member court." <u>Ante</u> at 20. While I agree with the rule, I disagree that there is a reasonable basis here for reconciliation. The majority reconciles the decisions by ignoring the precedent of <u>Kent</u>, creating an unsupported, never discussed "fact" distinction in <u>Brown</u> and declaring the reasoning held material by the majority opinion in <u>Rush-Richardson</u> now "immaterial." Such reconciliation, in my view, does not comport with the doctrine of stare decisis. <u>Cf.</u> <u>Battaglia v. United States</u>, 303 F.2d 683, 686-87 (2d Cir. 1962) (Friendly, J., concurring).

-25-

"[T]he life of the law consists to a very large extent in the guidance both of officials and private individuals by determinate rules which . . . do *not* require from them a fresh judgment from case to case." H.L.A. Hart, The Concept of Law 135 (2d ed. 1994). Here, the predictability of the law suffers as the majority's creative distinction leaves practitioners wondering what will happen in the next case. See Payne v. Tennessee, 501 U.S. 808, 827 (1991) ("*Stare decisis* . . . promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.").

The statute does not require the firearm be loaded to establish the "in furtherance of" element. See 18 U.S.C. § 924(c)(1)(A). But the majority's decision today will lead future panels to view the presence of a loaded firearm near distribution-quantity drugs as an outcome-determinative factor in the prejudice analysis, drifting away from the statutory language.

## C.  **Rush-Richardson**

In Rush-Richardson, 574 F.3d at 906, we adhered to Kent and Brown and reversed another § 924(c) conviction on plain-error grounds. In so holding, we explicitly relied on the facts that (1) "the government presented no definitive evidence of Rush-Richardson's fingerprints on, or physical evidence connecting Rush-Richardson to, the firearms," (2) "[o]ne fingerprint was discovered on one firearm, and that fingerprint was not Rush-Richardson's," and (3) the prosecutor's closing argument emphasized the erroneous definition of "in furtherance of" in the jury instructions. Id. at 912.[12]

---

[12]Similarly, in reversing, the Brown court remarked "the government's closing argument exacerbated the error in the instructions." Brown, 560 F.3d at 768.

The majority ignores or labels as "immaterial" these three important parts of Rush-Richardson's holding, which all militate in favor of reversal of the Vanovers' convictions. Ante at 20. In the Vanovers' case, forensic analysis revealed fingerprints on the High Point's magazine, but those fingerprints did not belong to either Butch or Barb. In her closing argument, the prosecutor stated:

> [P]art of the instruction that the judge has given you is that the government need only prove that the firearm had the potential to facilitate. We don't have to prove that either [of the defendants] pointed that gun at Debra Dale on December 19th, but what we do have to show you is that the firearm was present, both of them knew that the firearm was present and that they had control over that firearm.

In not weighing the absence of the Vanovers' fingerprints, the presence of unidentified fingerprints, or the prosecutor's closing argument, the majority ignores Rush-Richardson's holding that these three facts are relevant and weigh in favor of reversal. In effect, the majority today lends precedential force, not to the Rush-Richardson majority's opinion, but to the concurrence in Rush-Richardson, which disapproved of the majority's reliance on fingerprint evidence. See Rush-Richardson, 574 F.3d at 914-15 (Colloton, J., concurring) (arguing "the absence of fingerprints and physical evidence does not in my view materially advance Rush-Richardson's showing that the mistaken jury instruction affected his substantial rights on the 'in furtherance' element").

## II.     What to Do

### A.     Conflicting Prior Panel Decisions

When the full precedential force of Kent, Brown, and Rush-Richardson is recognized, our precedents in this narrow area of the law do not squeeze into the analytical boxes in which the majority attempts to place them. Brown, for example,

is irreconcilable with <u>United States v. Mashek</u>, 606 F.3d 922 (8th Cir. 2010), and <u>United States v. Coleman</u>, 603 F.3d 496 (8th Cir. 2010). This is not surprising, because neither the <u>Mashek</u> opinion nor the <u>Coleman</u> opinion mentions <u>Brown</u>.[13]

We now are faced with a tangle of conflicting prior panel opinions. Under this circuit's prior panel rule, when two or more previous panel decisions conflict, a subsequent panel is free to follow the decision which is more persuasive and faithful to the law. <u>See</u> <u>Williams v. NFL</u>, 582 F.3d 863, 879 n.13 (8th Cir. 2009), <u>cert.</u> <u>denied</u>, 131 S. Ct. 566 (2010). Elsewhere I have expressed my disagreement with this formulation of the prior panel rule, joining the dissent in <u>Williams v. NFL</u>, 598 F.3d 932, 934-35 (8th Cir. 2009) (Colloton, J., dissenting from denial of rehearing en banc) (characterizing this circuit's prior panel rule as "peculiar" and fostering unpredictability in the law). But we may follow that rule here.

## B. Analysis

After weighing our conflicting precedents, I conclude <u>Mashek</u> and <u>Coleman</u> are more persuasive and faithful to the law than <u>Kent</u> and <u>Brown</u>. Plain-error relief is not warranted here.

There is only a slight difference between the "during and in relation to" and "in furtherance of" standards. <u>See</u> <u>United States v. Gamboa</u>, 439 F.3d 796, 810 (8th Cir. 2006). The Supreme Court has observed that plain-error review should be "circumscribed," that is, a power to be exercised "sparingly." <u>Jones v. United States</u>, 527 U.S. 373, 389 (1999). "It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977).

---

[13]The parties did not bring <u>Brown</u>, <u>Mashek,</u> or <u>Coleman</u> to our attention. <u>Mashek</u> and <u>Coleman</u> were decided after oral argument.

This case does not present one of the narrow circumstances in which the firearm reasonably could have been possessed "during and in relation to" drug trafficking, but not "in furtherance of" drug trafficking, or the rare case in which our circumscribed plain-error power justifies the reversal of the Vanovers' convictions. The evidence against the Vanovers is strong. The High Point was next to a large quantity of cash and drug packaging materials, in the same room as methamphetamine, ammunition, and drug paraphernalia, and near the edge of the bed for easy access. Dale testified Barb sold Dale methamphetamine in an adjacent master bathroom. I would not exercise our discretion to notice any plain error. See Weems, 217 U.S. at 362.

## III.   CONCLUSION

I fully concur in the opinion of the court with respect to the first through fifth issues. With respect to the sixth issue, I concur in the judgment only.

_____