# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 17-1914

———————————————

United States of America

*Plaintiff - Appellee*

v.

Kyle Maurice Parks

*Defendant - Appellant*

——————————

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

——————————

Submitted: April 12, 2018
Filed: August 30, 2018

——————————

Before SMITH, Chief Judge, WOLLMAN and LOKEN, Circuit Judges.

——————————

WOLLMAN, Circuit Judge.

A jury found Kyle Maurice Parks guilty of one count of transportation of a minor to engage in prostitution in violation of 18 U.S.C. § 1591(a)(1) and (b)(2); two counts of attempted transportation of a minor to engage in prostitution in violation of 18 U.S.C. §§ 1591(a)(1), (b)(2), and 1594(a); and six counts of transportation of an individual with intent to engage in prostitution in violation of 18 U.S.C. § 2421(a). Parks appeals from the denial of his motion to suppress evidence. He also argues that

the district court[1] erred in admitting certain evidence and in denying his motion for judgment of acquittal on two of the counts. We affirm.

## I. Background

Detective Mark Young, a Columbus, Ohio, police officer assigned to the Ohio Human Trafficking Task Force, received information on December 2, 2015, that seventeen-year-old T.S. had run away from an Ohio juvenile residential facility. The next day, T.S.'s mother called Young, saying that T.S. had contacted her and said that she was on her way to Florida with at least two other individuals. Believing that T.S. was in trouble, Young requested an emergency cell phone ping to determine her location. The ping showed that T.S.'s cell phone was located near the vicinity of a Red Roof Inn in St. Charles, Missouri.

Detective Young asked the St. Charles Police Department to dispatch officers to the Red Roof Inn to check for any vehicles with Ohio license plates. St. Charles police officers went to the hotel, where they located a gray van bearing temporary Ohio license tags that revealed that the vehicle was registered to Parks. Upon being provided this information, Young responded that he was familiar with Parks and that T.S. was likely with him.

In response to their inquiries, a hotel employee told the officers that there were two young women, R.W. and K.O., from Columbus, Ohio, who currently had rooms at the hotel. The officers first went to nineteen-year-old R.W.'s room. They knocked on the door, R.W. answered, and they informed her that they were looking for T.S. Although T.S. was not in R.W.'s room, the officers noticed another young woman, seventeen-year-old T.M., there. Officers then went to twenty-four-year-old K.O.'s

---

[1]The Honorable John A. Ross, United States District Judge for the Eastern District of Missouri.

room, where they located T.S. and a fifteen-year-old girl, L.L. R.W. and K.O. consented to the searches of the hotel rooms, in which officers found stained and soiled linens, drug paraphernalia, feminine hygiene products, prepaid gift cards, packages of condoms, used condoms, male clothing, items bearing Parks's name, and an Ohio municipal court document citing K.O. for prostitution. Officers also obtained a Red Roof Inn surveillance video that showed R.W., K.O., and Parks together at the check-in counter.

Police transported the five young women to a locked juvenile facility in St. Charles, where they were interviewed by law enforcement. K.O. and T.S. both told the officers that they had committed acts of prostitution while at the Red Roof Inn and that they had given the money that they had earned to Parks. K.O. also stated that she had previously worked as a prostitute for Parks in Ohio.

Officers then discovered that Parks, his van, and seventeen-year-old S.L. were missing. The next morning's shift officers were briefed on Parks and the incident at the Red Roof Inn. An email was sent out within the department, informing officers that they needed to be on the lookout for Parks and his vehicle. The email also included a photo of Parks.

Later that morning, Parks walked into the St. Charles County police headquarters and approached a police services officer who was working at the lobby desk. Parks gave the officer his name, said that he was from Ohio, and that he was there to bail out a female friend. The services officer recognized Parks and notified Officer Paul Yadlosky and Detective Stephanie Kaiser. When Officer Yadlosky arrived in the lobby, Parks walked towards the door and looked out at his van. When Detective Kaiser arrived, she noticed a gray van matching the email's description in the parking lot.

Knowing that there was a missing girl who had last been seen with Parks and that the gray van was registered to Parks, Officer Yadlosky and Detective Kaiser decided to go out to the van to look for the girl. Detective Kaiser peered in the window and saw an older girl lying in the middle row of seats, wrapped in a blanket. Because the girl's face was covered, it was difficult to determine her condition. The girl did not respond when the officers rapped on the van's window. Officer Yadlosky then opened the van door, at which point the woman responded in a "sluggish and slow" manner. Officer Yadlosky testified that he could smell marijuana upon opening the van door and that he noticed a bag of marijuana on the floor of the van when the girl sat up. Officer Yadlosky seized the marijuana. The girl was later identified as missing seventeen-year-old S.L.

Officer Yadlosky quickly searched the van to ensure that no one else was inside. In doing so, Officer Yadlosky noticed cell phones, clothing, and condoms. Because of the van's cluttered condition, Officer Yadlosky requested that a K-9 officer conduct a search for any hidden narcotics. The drug dog alerted to the driver's side passenger door. Law enforcement officers thereafter conducted a full search of the van and seized sales receipts for prepaid gift cards, a receipt containing a Backpage.com (Backpage) email address, prepaid phone gift cards, eighty-eight condoms, and three cell phones.

Law enforcement officers later executed a search warrant for Parks's Ohio office suite, which contained several rooms, including multiple bedrooms and a lounge area. One of the bedrooms contained a mattress, soiled bedding, and drug paraphernalia. In the lounge area, officers found a mini bar, sofas, a coffee table with a condom case, and Parks's XXXREC business cards advertising "nude or partially nude, manies, pedies, full body massages, house cleaning, and dancing." Other items seized during the search included women's clothing, a prepaid gift card, a shipping

box with Parks's name on it that contained bottles of an unknown liquid advertised as a male enhancement, used condoms, and a DVD entitled "The Bottum."[2]

Parks's cell phone was also searched pursuant to a warrant. A forensic technician discovered numerous photos of partially dressed women and multiple text messages in which Parks inquired about ads on Backpage, stating that he was the owner of XXXREC and that he could "provide [them with] in call location and safe, reliable out call transportation."[3]

Parks was charged in a nine-count superseding indictment with offenses related to sex-trafficking and prostitution. He filed a motion to suppress the evidence seized during the search of his van. A magistrate judge[4] recommended that Parks's motion be denied because the search of the van was lawful under the community caretaker and automobile exceptions to the warrant requirement and that the items seized inevitably would have been discovered during an inventory search. The district court overruled Parks's objection to the recommendation, adopted the report and recommendation, and denied the motion to suppress.

---

[2]A special agent with the Ohio Bureau of Criminal Investigation and Central Ohio Human Trafficking Task Force testified that based on his background and training, the term bottum typically refers to the pimp's most loyal female who does not go on dates herself, but instead works directly below the pimp and helps manage the other women.

[3]In the pimp-prostitution subculture, the term "in call" refers to the practice of the customer traveling to the prostitute to engage in commercial sex.

[4]The Honorable John M. Bodenhausen, United States Magistrate Judge for the Eastern District of Missouri

At trial, the government presented the evidence seized from Parks's van, office, cell phone, and the hotel rooms. The government called sixteen witnesses, including several law enforcement officers and four victims.

L.L. testified that she had run away from an Ohio juvenile facility when T.S. called her and invited her to go on a road trip to Florida. L.L. agreed, and Parks picked her up in his van on December 2, 2015. There were five other women with Parks—T.S., T.M., S.L., and two women L.L. did not know, but who were later identified as R.W. and K.O. Parks provided the women with marijuana to smoke while they drove. Realizing later that they were not on their way to Florida, L.L. asked Parks to take her home. Parks responded that he would put her on a bus to Ohio, but refused to tell her when he would do so. L.L. then fell asleep and upon awakening learned that they were in the parking lot of the Red Roof Inn in St. Charles.

L.L. testified that Parks directed R.W. and K.O. to pay for two hotel rooms. He then assigned each of the girls to a hotel room. L.L. stayed in a room with T.S., K.O., and Parks. Parks told the women that they could sleep for a few hours in their rooms. When he woke them up, he told them to shower and get dressed because they were going to "post up." L.L. did not know what this meant, but she saw Parks on his phone with a card, and then he started taking pictures of the women. Parks asked to take L.L.'s picture, but she told him no and that she was only fifteen. L.L. then witnessed the young women going back and forth between rooms, having sex, and giving Parks some of their money. She also witnessed K.O. using heroin while in the hotel room.

T.S. testified that Parks approached her as she walked down a street in Columbus, Ohio, after her flight from the juvenile facility. He told her about Backpage and that he wanted her to go on dates—but that she did not have to have sex—and in return, he would give her "anything that [she] wanted." Parks drove T.S. to his office, where she met T.M., S.L., and K.O. Parks gave T.S. marijuana and K.O.

heroin. Later that night, Parks arranged for T.S. to go on a "date" at his office. T.S. went into a bedroom with a man and had sex. Parks took the money the man had paid her. The next day, T.S. left with Parks and the other young women, believing that Parks was going to take them to Florida.

Once they arrived in St. Charles, T.S. went to sleep in the hotel room. She woke up to Parks's telling her that she needed to get up so that she could make some money. Parks then helped T.S. post an advertisement on Backpage, with the expectation that she would give Parks the money she earned by having sex with men. Parks gave T.S. condoms and set up a price schedule for her—$80 for fifteen minutes, $180 for thirty minutes, and $200 for one hour. T.S. went on one one-hour date later that night. The man paid her $197 for the sexual encounter, which she gave to Parks. Parks then gave $60 back to T.S., keeping the rest for himself. T.S. later refused Parks's request that she have sex with him.

S.L. testified that she met Parks on November 29, 2015. The next day, Parks drove S.L. to her boyfriend's funeral and then brought her and her friend, T.M., back to his office. Once there, Parks gave S.L. marijuana and asked her to have sex with him. He also told S.L. that he needed money to go out of town and asked her to have sex with a man for money. S.L. was scared, but agreed to the request because she had witnessed Parks "put his hand" on her friend. Parks arranged for a man to come to his office. The man had sex with S.L. and paid her $100, which she gave to Parks. The next morning S.L. traveled with Parks and the other women to St. Charles. During the drive, S.L. told Parks that she was seventeen years old.

Upon arriving in St. Charles, Parks gave S.L. condoms and told her to take photos of her body so that she could make some money. One man came to see S.L. that night, saying to her, "You look like you are scared. You look like you don't want to do this." S.L. responded, "I got to, because I'm far from home." The man responded that she did not have to do anything and gave her the money without

requiring her to have sex with him. Parks later asked S.L. for the money that she had made. Parks and S.L. then left the hotel to get food.

Parks and S.L. returned to the hotel and saw that both hotel room doors were open and that the police were there. S.L. told Parks that she wanted to go back to Ohio, but Parks told her that he was going to "try to get the girls out." The two thereafter smoked marijuana and S.L. fell asleep in the back of Parks's van. S.L. testified that she had difficulty waking up when she heard police rapping on the window.

T.M. was the final victim to testify, saying that she had met Parks in Ohio through a friend in the fall of 2015. Parks drove T.M. and her friend to a house, where T.M.'s friend went inside for twenty minutes and then returned to the car and handed Parks money. T.M. met Parks for the second time when he drove her and S.L. to his office after S.L.'s boyfriend's funeral. T.M. stated that when they arrived at the office, Parks gave her marijuana and told her that she was going to go with him on a trip for Backpage and that she would be "basically prostituting." Parks knew that T.M. was seventeen years old.

T.M.'s friend, R.W., went with her on the trip to St. Charles. T.M. testified that Parks had told R.W. that she would go on the trip for Backpage. After arriving in St. Charles, Parks told the girls that it was time to post on Backpage and thereafter helped T.M. and R.W. create advertisements.

Parks then testified on his own behalf. He stated that he owned an adult entertainment company, which included escorting, nude modeling, exotic dancing, adult conversation, and manicures, pedicures, or massages by nude or partially nude attendants. Parks also ran a video-calling service, which allowed men to call in and watch young women masturbate, as well as a 1-900 service for men to call and have adult conversations with young women. Additionally, Parks stated that he traveled

often because of another business and that he would bring exotic dancers on his trips because he would get paid for arranging them to perform at clubs. He admitted that he had transported all six of the victims from Ohio to Missouri, but said that the only woman he had invited on the trip was K.O. He also testified that he did not know the true ages of the women or that they were posting on Backpage. He later admitted, however, that he had told his daughter that he "had a little escort service [in Missouri], and they busted it."[5]

Following a four-day jury trial, the jury returned guilty verdicts on all nine counts charged against Parks. The district court sentenced Parks to 300 months' imprisonment, to be followed by a lifetime term of supervised release.

## II. Discussion

### A. Motion to Suppress Evidence

Parks argues that the district court erred in denying his motion to suppress evidence obtained during the warrantless search of his van. We review *de novo* the district court's denial of a motion to suppress evidence and "the factual determinations underlying the district court's decision for clear error." United States v. Harris, 747 F.3d 1013, 1016 (8th Cir. 2014).

"Searches conducted without a warrant are per se unreasonable, subject to a few well-established exceptions." United States v. Hill, 386 F.3d 855, 858 (8th Cir. 2004). "One such exception applies when police officers engage in a community caretaking function." United States v. Smith, 820 F.3d 356, 360 (8th Cir. 2016) (citing Cady v. Dombrowski, 413 U.S. 443, 441 (1973)). Under this exception, an officer may enter

---

[5]Detective Derek Stigerts testified that escort is "a fancy term for prostitution." If used as a noun, then it refers to the actual prostitute, but if used as a verb, then it refers to working as a prostitute.

a property without a warrant when "the officer has a reasonable belief that an emergency exists requiring his or her attention." Id. (quoting United States v. Quezada, 448 F.3d. 1005, 1007 (8th Cir. 2006)). To determine whether an officer had such reasonable belief, we look to the facts known to the officer at the time of the decision to enter the property. Id. (internal citations omitted); see also Quezada, 448 F.3d at 1007 (holding that reasonable belief under the community caretaker warrant exception "is a less exacting standard than probable cause" (citing Maryland v. Buie, 494 U.S. 325, 336-37 (1990))).

Based on the facts that Officer Yadlosky knew at the time he opened the van door, an officer in his position could have a reasonable belief that there was an emergency that required his attention. He was aware of Parks's suspected prostitution activities at the Red Roof Inn, that law enforcement was looking for a gray van with temporary Ohio license tags, and that there was a missing girl who was likely with Parks. Parks had told Officer Yadlosky his name and that he was from Ohio. It was with this knowledge that Officer Yadlosky and Detective Kaiser went to the van in search of the missing girl.

Officer Yadlosky developed probable cause to search the van under the automobile warrant exception when he opened the door and smelled marijuana, saw suspected marijuana on the van floor, and observed an apparently comatose young woman therein. See Hill, 386 F.3d at 858 (holding that the automobile exception to the warrant requirement authorizes officers to search a vehicle if they have probable cause to believe that "the vehicle contains evidence of criminal activity" (citing United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003))); see also United States v. Daniel, 809 F.3d 447, 449 (8th Cir. 2016) ("Probable cause exists when the facts available to an officer would warrant a person of reasonable caution to believe that contraband or other evidence of a crime is present." (citing Florida v. Harris, 568 U.S. 237, 243 (2013))). Because both the entrance into and the search of the van were lawful, the district court did not err in denying Parks's motion to suppress.

## B. Evidence of Parks's Other Acts

Parks argues that the district court erred in admitting evidence that Parks asked S.L. and T.S. to have sex with him and that he provided drugs to the young women. We review a district court's evidentiary rulings for abuse of discretion.[6] United States v. Thomas, 760 F.3d 879, 883 (8th Cir. 2014).

Parks argues that because he was not charged with any crime relating to the solicitation of sex or to drugs, the evidence is irrelevant and therefore should not be admissible. We disagree. *"Res gestae*, also known as intrinsic evidence, is 'evidence of wrongful conduct other than the conduct at issue . . . offered for the purpose of providing the context in which the charged crime occurred.'" United States v. Campbell, 764 F.3d 880, 888 (8th Cir. 2014) (quoting United States v. Johnson, 463 F.3d 803, 808 (8th Cir. 2006)). "Such evidence is admitted to complete the story or provide a total picture of the charged crime." Id. (alterations and internal quotation omitted).

The district court did not err in admitting the testimony as *res gestae* evidence. Detective Derek Stigerts, an expert witness from the FBI's Child Exploitation Task Force, testified about how pimps often recruit, coerce, and control prostitutes. Detective Stigerts discussed how a "finesse pimp" will often control and manipulate women through love, affection, drugs, and other non-violent methods. Specifically, he explained that pimps often recruit minors who are runaways without a place to go by offering the young women a place to stay and at times a "boyfriend/girlfriend type of relationship." Once the victim agrees, the pimp may attempt to get her addicted to drugs, and then threaten to withhold the drugs if the victim does not agree to do what the pimp demands. In light of these circumstances, Parks's requests for sex from the

---

[6]Parks did not object when the government questioned T.S. regarding Parks's request to have sex with her. We therefore review this claim for plain error. See United States v. Novak, 866 F.3d 921, 923 (8th Cir. 2017) (standard of review).

victims, as well as his offering of drugs, provided context to the prostitution crimes with which he was charged, thus rendering the evidence admissible.

Parks further contends that the district court erred in admitting the evidence under Federal Rule of Evidence 404(b) because the potential prejudice of the evidence outweighed its probative value. Other acts evidence may be admissible for purposes of "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). To admit such evidence, the government must show that "(1) it is relevant to a material issue, (2) it is similar in kind and not overly remote in time to the charged offense, (3) it is supported by sufficient evidence, and (4) its potential prejudice does not substantially outweigh its probative value." United States v. Ellis, 817 F.3d 570, 579 (8th Cir. 2016). We will reverse a district court's ruling "only when the evidence clearly had no bearing on the case and was introduced solely to show defendant's propensity to engage in criminal misconduct." United States v. Farish, 535 F.3d 815, 819 (8th Cir. 2008).

Parks argues that the evidence portrayed him as a statutory rapist and drug dealer and thus "lured [the jury] into declaring guilt." Appellant's Br. 44. To convict Parks under 18 U.S.C. § 1591, the jury had to find that he "knowingly . . . recruit[ed], entic[ed], harbor[ed], transport[ed], provid[ed], obtain[ed], advertis[ed], maintain[ed], patroniz[ed], or solicit[ed] by any means . . . [a] person to engage in a commercial sex act." 18 U.S.C. § 1591. Both Parks's knowledge and his intent were thus called into question during trial. See Campbell, 764 F.3d at 889 (citing United States v. Jarrett, 956 F.2d 864, 867 (8th Cir. 1992)). The probative value of the evidence accordingly outweighed the danger of potential prejudice because it showed Parks's intent to solicit, entice, and maintain these women so that they would engage in commercial sex acts. The district court did not abuse its discretion in admitting evidence regarding Parks's solicitation of sex from S.L. or T.S. or his providing drugs to the young women.

## C. Sufficiency of the Evidence

Parks argues that the evidence was insufficient to support his convictions that he transported K.O. and R.W. from Ohio to Missouri for the purposes of prostitution. "We review the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Hamilton, 332 F.3d 1144, 1148 (8th Cir. 2003) (citation omitted). "Our role is not to reweigh the evidence or to test the credibility of the witnesses, because questions of credibility are the province of the jury." United States v. Vanover, 630 F.3d 1108, 1116 (8th Cir. 2011) (per curiam) (internal quotations and alterations omitted).

A defendant violates 18 U.S.C. § 2421 if he "knowingly transports any individual in interstate or foreign commerce . . . with intent that such individual engage in prostitution. . . ." 18 U.S.C. § 2421(a). Parks does not dispute that he drove K.O. and R.W. from Ohio to Missouri. Rather, he argues that the evidence was insufficient to prove that he intended for the women to engage in prostitution. Evidence showed Parks, K.O., and R.W. checking into the hotel together. K.O. admitted to law enforcement that she had committed acts of prostitution while she had been in Missouri and that she had given the money she earned to Parks. She also stated that she had previously worked as a prostitute for Parks in Ohio. Additionally, T.M. testified that Parks told R.W. that they were going on a trip for Backpage, that Parks provided R.W. with condoms, and that he helped R.W. set up an advertisement on Backpage after they arrived in Missouri. The four testifying victims each said that Parks awoke the women at the hotel by telling them they needed to get up so they could make money by posting on Backpage. Finally, Parks admitted that he told his daughter that he had been running an escort service in Missouri, but that it had gotten "busted." When viewed in light most favorable to the verdict, the evidence was sufficient to enable a reasonable jury to find that Parks transported all six women—including K.O. and R.W.—in interstate commerce with the intent to have

-13-

them engage in prostitution.  See United States v. Jones, 16 F.3d 275, 278 (8th Cir. 1994) ("Each element of a crime, including intent, may be proven by circumstantial evidence.").

Parks has raised a number of issues in a pro se brief. "We generally do not accept pro se motions or briefs when an appellant is represented by counsel," and we decline to do so here.  See United States v. Donnell, 596 F.3d 913, 925-26 (8th Cir. 2010).  Parks has also submitted claims of ineffective assistance of counsel and prosecutorial misconduct.  "[B]ecause such claims usually involve facts outside of the existing record and are therefore best addressed in postconviction proceedings," United States v. Jones, 586 F.3d 573, 576 (8th Cir. 2009), we decline to address them in this proceeding.

The judgment is affirmed.

_____